DONALD S. PIRIE,

*Plaintiff,*

vs.

GERTRUDE KAMPS,

*Defendant.*

(No. 2491; April 10th, 1951; 229 Pac. (2d) 927)

84

For the plaintiff the cause was submitted upon the brief and also oral argument of Ernest Wilkerson of Casper, Wyoming.

For the defendant the cause was submitted upon the brief of Houston G. Williams of Casper, Wyoming.

For the Wyoming Press Association a brief was submitted by Marvin L. Bishop of Casper, Wyoming, appearing amicus curiae.

## OPINION

BLUME, Justice.

In this case plaintiff and defendant entered into an agreement for the sale of certain property in Casper, Wyoming. The plaintiff in selling the property agreed that he would bring an action to quiet title to the premises. In bringing such action, he published notice required by law in the Casper Morning Star, a tabloid newspaper, a copy of which is contained in the record.

Defendant refused to accept the title to the property on the ground that the notice was not published in a legal newspaper in this state, and specifically because the tabloid newspaper mentioned did not contain pages of the size mentioned in the statute, namely, Section 27-825, Wyo. Comp. St. 1945. As we understand it, no other objection was made, apparently conceding that the newspaper had been regularly published for a period of one year and had the circulation required by the foregoing section of the statute. Upon the refusal of the defendant to accept the title, plaintiff brought this action for specific performance of the contract. An answer was duly filed by the defendant. Thereupon the court certified to this court the following constitutional questions, namely whether or not that portion of Section 27-825, Wyoming Compiled Statutes 1945, providing as follows: "the publication of any legal notice or of any printing or advertising required to be published under the laws of this State, shall be of no force or effect unless published in a newspaper * * * which has a page the size of not less than twelve (12) inches by nineteen (19) inches" is in conflict with the following constitutional provisions, namely:

1. Article 1, Section 6, of the Constitution of the State of Wyoming, which provides that no person shall be deprived of life, liberty, or property, without due process of law.

2. Article 1, Section 30 of the Constitution of the State of Wyoming, which provides that "perpetuities and monopolies are contrary to the genius of a free state and shall not be allowed."

3. Article 1, Section 34, of the Constitution of the State of Wyoming, which provides that "all laws of a general nature shall have a uniform operation."

4. Article 3, Section 27, of the Constitution of the

State of Wyoming, which provides that "the legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * grant unto any corporation, association, or individual * * * any special or exclusive privilege, immunity or franchise whatever * * *."

5. Amendment 14, Section 1, of the Constitution of the United States, which provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The statute in question reads as follows:

"The publication of any legal notice, or of any printing or advertising required to be published under the laws of this state, shall be (of) no force or effect unless published in a newspaper which has been regularly issued at least once each week for a period of fifty-two (52) consecutive weeks prior to the date of the first publication of such notice or advertisement, which has a paid circulation of not less than five hundred (500) *and which has a page the size of not less than twelve (12) inches by nineteen (19) inches:* Provided, however, that any paper having the status of a legal newspaper at the time of the passage of this Act (§§ 27-823-27-285) shall not be affected hereby. Provided, however, that the provisions of this section shall not apply in counties where no newspaper has been regularly issued for fifty-two (52) consecutive weeks, nor where there is but one newspaper in the county, nor in any county where no newspaper can meet the requirements of this act." (Italics supplied.)

1. The provision of our Constitution that no one

shall be deprived of life, liberty or property without due process of law does not interfere with the police power of the state to enact laws for the general welfare of the people. At the same time any law in furtherance of the police power must be reasonable and not arbitrary. State vs. Langley, 53 Wyo. 332, 342-344, 84 P. 2d 767. And the concept of the term "due process of law" is broad. Mott on Due Process of Law, 256-274, has shown how the courts in this country groped for and finally came to recognize the close relationship between equality before the law and due process of law, and that arbitrary, unwarranted and special acts not uniform in their operation, were not consistent therewith. Taylor on Due Process of Law, 303-304 states: "The primary purpose of the framers of our original state constitutions,—prefaced by bills of rights epitomizing the seminal principles of English constitutional law as it existed in 1776—was to make impossible here all forms of arbitrary and confiscatory legislation, whether in the form of ex post facto laws, or laws lacking generality and equality, and ignoring the division between legislative and judicial power, under which could be confiscated or forfeited the life, liberty or property of a private citizen by a legislative edict passed in defiance of 'the law of the land.' * * * The primary purpose of the founders of American constitutional law was to wipe out the entire system of legislative despotism over life, liberty and property, based in England not only upon a denial of the right to due process, but also upon the denial of the principles demanding generality and equality in the laws. Their effort was, first, to subject all state power—executive, legislative and judicial—to the yoke of constitutional limitations consisting of epitomies of English constitutional law as it existed in 1776; second, to further limit the legislative power with the requirement that all laws must be equal and general." In 16 J. S. 1150, speaking of due process of

law, it is stated: "Broadly speaking, the purpose of the guaranty is to prevent governmental encroachment against the life, liberty, and property of individuals, to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice, and to protect property from confiscation by legislative enactments, from seizure, forfeiture, and destruction without a trial and conviction by the ordinary modes of judicial procedure, to secure to all persons equal and impartial justice and the benefit of the general law, due process of law being frequently spoken of as including equal protection of the laws, which is secured by laws operating on all alike." And so it is said in Barrington vs. Barrington, 206 Ala. 192, 89 So. 512: " 'Due process of law guaranteed by the federal constitution has been defined in terms of the equal protection of the laws, that is, as being secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.' " In Sears vs. Cottrell, 5 Mich. 251, the court, after identifying the term "due process of law" with the term "the law of the land," stated: "By 'the law of the land' we understand laws that are general in their operation, and that affect the rights of all alike; and not a special Act of the Legislature, passed to affect the rights of an individual against his will and in a way in which the same rights of other persons are not affected by existing laws." Many other cases similar in effect might be cited. However, though the general concept of due process of law appears to be broad and sweeping, it is not always easy to determine whether it applies under particular circumstances. So it has been said that the term is not susceptible of comprehensive definition. 16 C. J. S. 1140. And it is clear that the framers of the various state constitu-

tions, including our own, were not at all certain as to what the term comprehended. Hence, they embodied therein special provisions for uniformity of operation of laws, provisions against special legislation in certain cases, and provisions against special privileges, immunities, and monopolies. Even the framers of the Fourteenth Amendment of the Constitution of the United States were not satisfied as to what due process of law embraced, and so embodied therein a provision as to immunities and privileges and equal protection of the law.

Coming down to the specific question before us, it is clear that the provision of the legislation in question here does not deprive anyone of his life. Nor does it deprive anyone of his property. We held in the case of In Re Gillette Daily Journal, 44 Wyo. 226, 11 P. 2d 265 that the section of the statute now under consideration does not deprive anyone of any property. We there considered the constitutional question here under consideration, as well as Section 35 of Article 1 of our Constitution, providing that no law impairing the obligations of any contract shall ever be made. We said in that connection referring to the statute: "It simply prescribes under what circumstances a published notice shall have the effect of a legal notice. The contention made herein is evidently based upon the assumption that the plaintiffs have a property right in making such publications. But the assumption is wrong. The legislature has undoubtedly the right, in exercising the sovereign or police power of the state, to make reasonable regulations in regard to legal notices. The publication thereof is not a right, but at most a privilege, which the legislature bestows, and which it can modify or take away without violating the constitutional provisions just mentioned." See similar in effect State of Ohio vs. Board, 32 Weekly L. Bulletin 88, 1 Ohio Dec.

584. So the only question remains as to whether or not the provision in question here deprives anyone of liberty. It is stated that: "The privilege of contracting is both a liberty and a property right." Morris vs. Holshouser, 220 N. C. 293, 17 S.E. 2d 115, 137 A.L.R. 733 and cases cited. In the case at bar the statute does not prohibit the entering into a contract between the owner of a tabloid newspaper and the plaintiff in this action or anyone else. Whether or not a publication made pursuant to such contract shall have the effect of a legal notice is a collateral matter. It was held in Coppage vs. Kansas, 236 U.S. 1, 59 L. Ed. 441, 35 Sup. Ct. 240 that: "Included in the right of personal liberty and the right of private property—partaking of the nature of each— is the right to make contracts for the acquisition of property." But a different question arises if the right does not partake both of the right of contract and the right of property as in the case at bar. It is true, as already indicated, that a number of cases consider due process of law as embracing other provisions of the Constitution designed for the protection of equality before the law. Mott, supra, page 279. Thus it was said in People vs. Max, 70 Colo. 100, 198 P. 150 that the contention that a law "abridges the privileges and immunities of citizens and denies equal protection of the law is included within the objection that it denies 'due process.' They stand or fall together." Still, to say that the right to have a notice published in a certain paper, and have it recognized as a legal notice, is part of the liberty of the people, possibly stretches the term "liberty" too far. And since it is not necessary to decide the point, we shall leave the first question submitted to us unanswered and proceed to discuss the remaining and more specific constitutional provisions submitted to us.

2. We think we may, for the purposes of this case,

consider that a monopoly is embraced within the term "special privilege" and that it is not necessary to consider the constitutional provision against monopolies separately. We said in the case of In Re Gillette Daily Journal supra: "We shall now proceed to consider as to whether or not the statutory provision in question is in violation of Section 34, Article I, of the Constitution providing that all laws of a general nature shall have a uniform operation, or in violation of Section 27 of Article III of the Constitution, which provides that the legislature shall not pass any special laws granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever, or in violation of the 14th amendment to the Constitution of the United States providing that no state shall deny to any persons within its jurisdiction the equal protection of the laws. These provisions have the same aim in view, and it was held in Jones v. Railway Co., 231 Ill. 302, 83 N.E. 215, 216 121 Am. St. Rep. 313, that by the constitutional provision that no special law shall be passed to give anyone any special privilege or immunity, 'a guarantee is given that all valid enactments of the legislature shall be uniform in their operation upon persons and property, and by it all citizens are assured the equal protection of the laws of the state.' " While that was said in connection with other provisions of the statute here in question, it is, we think, equally applicable in the case at bar. In the case of Jones vs. Railway Co. supra, the court considered the question of special laws and uniformity of operation of laws and stated in part: "The question arises: Is that enactment a special law conferring a special privilege upon plaintiff in error? The words 'privileges and immunities' are made use of in the Constitution of the United States and in various state Constitutions. The meaning of those words where so used has been considered by the courts. In the

Slaughterhouse Cases, 16 Wall. (U.S.) 36, 21 L. Ed. 394, in construing the fourteenth amendment to the Constitution of the United States, it was held that the privileges and immunities' mentioned in that amendment were inclusive of all the rights which the state governments were created to establish and secure, and we have no doubt that it is in this broad sense that the words 'privilege and immunity' are used in the clause of our Constitution above quoted, and that they include every right which can be conferred or granted by any law of the state. By that provision of our Constitution a guaranty is given that all valid enactments of the Legislature shall be uniform in their operation upon persons and property, and by it all citizens are assured the equal protection of the laws of the state. In Cooley on Constitutional Limitations (6th Ed.) pp. 481-483, it is said: 'A statute would not be constitutional * * * which should select particular individuals from a class or locality and subject them to peculiar rules, or impose upon them special obligations or burdens from which others in the same locality or class are exempt.' " In Van Harlingen vs. Doyle, 134 Cal. 53, 66 P. 44, 54 L.R.A. 771 the court considered a statutory provision similar to that now under consideration. And while we held in the case of In Re Gillette Daily Journal supra that the case was not decisive of the question as to the length of publication and as to the requirement of the number of subscribers, the following language nevertheless used in the case is applicable here: "The act confers particular privileges upon certain merchants and publishers, and imposes peculiar disabilities and burdensome conditions on other merchants and publishers, all of whom stand in the same relation to the law. It was not within the power of the legislature to evade the operation of the constitutional provisions by creating an arbitrary and unnatural distinction between persons

thus related to the law." In the case of Raney vs. County Commissioners, 170 Md. 183, 183 Atl. 548, the court considered a provision that no newspaper should be considered legal unless it was published with type set in the county for four years. The court construing the law said in part: "The test of the constitutionality of a statute ordinarily is not what has happened, but what may happen under it. So that the consequences of this particular statute are referred to, not as in themselves a sufficient reason for setting it aside, but as a graphic illustration of what may happen under it. And since it gives control of important and perhaps lucrative public business to a class of persons engaged in the publication of newspapers to the exclusion of all others lawfully engaged in the same business, and since that classification is based upon unreasonable and improperly discriminatory grounds, it tends to create such a monopoly as is denounced by Article 41 of the Maryland Declaration of Rights, deprives persons so excluded from the equal protection of the law, is null and void." See also Guthrie Daily Leader vs. Cameron, 3 Okl. 677, 41 P. 635.

Let us now consider the provisions in question here in the light of the principles above mentioned. It has been said that whether a newspaper is one of general circulation is a matter of substance and not of size. Burak vs. Ditson, 209 Ia. 926, 229 N.W. 227, 68 A.L.R. 538 and cases cited. The newspapers published in the time of Benjamin Franklin were undoubtedly much smaller than the newspapers of today and they may again in the future become much smaller than they are today. But we must base our decision on the conditions as they exist now and the size of a newspaper or purported newspaper nowadays may be so small that the legislature might determine that, in view of common usage, it is unlikely that it would be read by the general

public, and we are not prepared to hold that to prescribe a reasonable size is without the proper sphere of legislative power.

A tabloid newspaper, as ordinarily published, is not small except in comparison with what we may call the ordinary or standard newspapers such as the New York Times, the Chicago Tribune, the Denver Post and the Wyoming Tribune. We think we may take judicial notice of the fact that tabloid newspapers are published in many places and are ordinarily read generally, if sufficiently established for a length of time, so as to gain a general circulation. They contain approximately the same size of sheets as ordinary or standard newspapers but they differ in this: The sheets are folded once and instead of each sheet, printed on both sides, constituting two pages, it contains four pages as ordinarily reckoned and the columns of the printed matter run straight down the width instead of the length of the sheets. Giving a strict and the ordinary construction to the term "page," as used in the statute, the tabloid newspaper would not be a legal newspaper within the meaning of the statute, although that might not be true if the statute is liberally construed. If strictly construed as already mentioned, is the provision reasonable? We think not. As already stated, it is not questioned herein that the tabloid newspaper herein in question was regularly published for the length of time required by the statute, and that it had the required circulation. The aim of a statute relating to legal publications is, or should be, to have these publications made in a newspaper which is of general circulation in the community, so as to be generally read and so that the contents of the notice may be brought home to the public generally. No reason exists, we think, to give the publisher of an ordinary and standard newspaper a special privilege over that granted to the publisher of a

tabloid newspaper if legal notices inserted in the newspaper of the latter subserve that general aim, as we think is true here. To do so is contrary to the spirit of our Constitution to give all persons equal opportunities in conducting their business and the equal protection of the law. The provision of the statute here in question is a special law giving special privileges in contravention of Section 27 of Article 3 of our Constitution, and we accordingly answer the question relating thereto—being the fourth question submitted to us—in the affirmative. It is not necessary to specifically answer the remaining questions. In other words, in order that we may not be misunderstood, we think that legal notices published in a tabloid newspaper of the size here in question, which in other respects conforms to the requirements of the statute, are valid.

KIMBALL, C. J., and RINER, J., concur.