Bryan SCADDEN, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 86–39.

Supreme Court of Wyoming.

Feb. 5, 1987.

Leonard D. Munker, Public Defender, Martin J. McClain, Deputy Public Defender, for appellant.

A.G. McClintock, Atty. Gen., John W. Renneisen, and Sylvia Lee Hackl, Senior Asst. Attys. Gen., for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

URBIGKIT, Justice.

Appellant, a high school teacher and girl's volleyball coach, was convicted on one count of second degree sexual assault. The victim was a student and team member. Appellant was charged with using his position of authority to cause submission to sexual intercourse, in violation of § 6–2–303(a)(vi), W.S.1977. On appeal, appellant raises one statutory construction constitutional question, and six procedural or sufficiency issues, as claimed error:

I. Unconstitutionality of the statute: Section 6–2–303(a)(vi) violates Art. 1, § 6 of the Wyoming Constitution, and the Fourteenth Amendment to the United States Constitution.

II. Course-of-activities evidence: Introduction of testimony concerning appellant's teaching and coaching methods and his influence over students other than the two alleged victims violated the Wyoming Rules of Evidence, and deprived appellant of a fundamentally fair trial.

III. Sex-offense expert testimony: Admission of Detective Reikens' testimony about the range of responses she encountered as a police officer investigating sexual-abuse and sexual-assault cases constituted error.

IV. Motion for a mistrial: Denial of appellant's motion for a mistrial was unjustified in light of Ms. Hoxey's improper testimony as the State Crime Laboratory specialist, regarding the 38 undesignated pubic hairs found in the school closet where admitted sexual activity occurred.

V. Cumulative evidence: Rejection for introduction of the transcript of MBS' preliminary hearing denied appellant his constitutional right to defend.

VI. Sufficiency of the evidence: There was insufficient evidence to support appellant's conviction.

VII. Instructions: Refusal to give the jury Instruction 14 and appellant's proposed Instructions A and B was error.

Finding no reversible error, we affirm.

## FACTS

Bryan Scadden, then age 29, was a continuing-contract teacher and girl's volleyball coach at Cheyenne's East High School. The sexual-assault allegations involve his relationship with MBS, a high school student and volleyball athlete who graduated in 1984, and with KR, another East High School student and volleyball player who graduated in 1985.

Commencing on or about November 1, 1983, when MBS was 17 years old, appellant and MBS began a course of sexual relations that continued through September 12, 1984. The sexual affair between the coach and KR began in October of 1984, and lasted a shorter time, terminating when police investigatory activities intervened.

Appellant was charged with five counts of sexual assault: one of first-degree sexual assault, and four of second-degree. The four second-degree sexual assault charges were brought under § 6–2–303(a)(vi), W.S. 1977, hereafter referred to as the "position of authority" statute. Appellant was convicted on one charge of second-degree sexual assault under that statute, and acquitted of the other four charged offenses. The conviction, which resulted in a sentence of confinement for two to five years, involved an incident with MBS that occurred about December 26, 1983.

Throughout the trial, the prosecution sought to portray appellant as a highly influential authority figure who encouraged the victims to become dependent on him in an atmosphere of trust, and who then used this influence to impose his sexual will on those students. Conversely, appellant sought to convince the jury that with MBS he developed a relationship of consensual sex founded on love, and that KR seduced him. In both cases he maintained that the young women freely consented. Appellant's argument apparently won favor with the jury on four charges but not the fifth—or it decided that a conviction on one offense would suffice. Logically, in result, the burden of proof beyond a reasonable doubt was not met on the four counts for which he was acquitted.

The ten-day trial was explicit in scope and detail, and encompassed graphic descriptions of various sexual acts. The details will only be included in this opinion as justified in the discussion and disposition of the issues raised on appeal.

### I

Unconstitutionality of the statute: Section 6–2–303(a)(vi) violates Art. 1, § 6 of the Wyoming Constitution, and the Fourteenth Amendment to the United States Constitution.

The relevant portion of the challenged statute, § 6–2–303(a)(vi), W.S.1977 states:

"(a) Any actor who inflicts sexual intrusion on a victim commits sexual assault in the second degree if * * *:

"(vi) The actor is in a position of authority over the victim and uses this position of authority to cause the victim to submit."

"Position of authority" is defined in § 6–2–301(a)(vi), W.S.1977 as

"* * * that position occupied by a parent, guardian, relative, household member, teacher, employer, custodian and [or] any other person who, by reason of his position, is able to exercise significant influence over a person."

It is well settled that " ' "every law must be presumed to be constitutional, with all reasonable doubt resolved in its favor." ' " *Keser v. State*, Wyo., 706 P.2d 263, 266 (1985), quoting from *Sanchez v. State*, Wyo., 567 P.2d 270, 274 (1977). In this context, we examine appellant's two constitutional challenges.

Appellant asserts that under *Griswold v. State of Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, reh. denied 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973), due process limits the state's ability to invade certain zones of privacy, and that a zone of privacy extends to individuals' decisions whether or not to engage in consensual sexual relations. He concedes that the State of Wyoming does have the power to regulate sexual relations, but that that power is limited by due-process protections of this fundamental and protected liberty. This court agrees.

However, appellant's argument fails to recognize that this case does not involve sexual relations between consenting adults. Appellant tried his case under the consent

theory, but the jury found him guilty under a statute and instructions which required it to find beyond a reasonable doubt that the victim did not consent. May it suffice to say that where the constitutional rights to privacy confront the state's police power, the privacy rights do not extend to sexual relations between high school coach-instructors and underage students. Within the purview of this case, we determine that instructors do not have a constitutional right to have sexual relations with minor students in the state's educational system. We distinguish any authority which pertains to adults or concerns the privacy-of-the-home relationship. E.g., *Griswold v. State of Connecticut, supra.* Cf. majority and dissenting opinions in *Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140, reh. denied, —— U.S. ——, 107 S.Ct. 29, 92 L.Ed.2d 779 (1986).

The jury was instructed both that lack of consent is an element of the crime which the State must prove beyond a reasonable doubt, and that consent is a defense to the crime for which appellant was convicted. Instruction No. 9 states, in relevant part:

"The necessary elements of each charge of sexual assault in the second degree are:

\* \* \* \* \* \*

"4. The alleged victim did not consent to sexual intrusion, but was caused to submit because of defendant's use of his position of authority as to her.

"If you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt as to a charge, then you should find the defendant not guilty of that charge.

"If on the other hand, you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt as to a charge, then you should find the defendant guilty of that charge."

Instruction No. 10 states:

"'Submit' as used in this case means that the person subjected to sexual intrusion by an actor, who is in a position of authority over that person, does not give free, full and reasoned consent."

Instruction No. 11 states:

"Consent by the person assaulted is a defense to the charge of sexual assault in the first and second degree. The defense of consent involves two separate elements.

"1. That the alleged victim did voluntarily consent to the act by word or conduct; and

"2. That the alleged victim had the present ability to consent or the defendant could not reasonably have known that the alleged victim lacked the present ability to consent.

"The State has the burden to prove beyond a reasonable doubt that there was no consent by the alleged victim."

The State contended, and the jury found, that the victim did not give free, full and reasoned consent to the sexual act for which appellant was convicted. See an excellent discussion of the course-of-conduct consent question in *State v. Kennedy,* Utah, 616 P.2d 594 (1980).

 The law in Wyoming, and indeed the law in general, has always limited some sexual contacts. The primary purpose for these proscriptions against sexual relations is the absence of acceptable consensual participation in the act. The State of Wyoming has a compelling interest in regulating sexual contacts between persons when one of those persons does not consent or lacks the capacity to consent. Incest or statutory rape are readily apparent examples. *State v. Ross,* 16 Wyo. 285, 301, 93 P. 299, reh. denied 16 Wyo. 285, 94 P. 217 (1908).

 In the exercise of its governmental police power, the legislature has thrown out the protecting arm of the law to guard those persons who are vulnerable to the powers and influence of one in a position of authority. This legislative act permits the State to show that the victim did not consent, by demonstrating that the perpetrator occupied a position of authority over the

victim and used that position to impose his sexual will. The consensual status of the conduct can be disproved by establishing the participants' relationship, and the defendant's use of that relationship to compel the victim to succumb. This statute is neither unreasonable nor arbitrary, and is within the police power of the state to enact laws for the general welfare of the people. *Kalman v. Western Union Telegraph Co.*, Wyo., 390 P.2d 724, 726 (1964); *Pirie v. Kamps*, 68 Wyo. 83, 229 P.2d 927, 929, 26 A.L.R.2d 647 (1951).

■ The challenged statute allows the factfinder to evaluate whether there was legal consent. Because, under the position-of-authority statute, the jury found no legal consent, this case does not involve consensual sexual relations, and appellant's due-process argument does not apply.

■ Appellant's equal-protection challenge that the statute is void for vagueness also fails. The well-established standard for an equal-protection challenge was stated by this court in *Keser v. State*, supra, 706 P.2d at 266:

"An ordinance or statute is void for vagueness if it fails to give a person of ordinary sensibility fair notice that the contemplated conduct is forbidden. Part of the rationale for this rule is that vagueness encourages arbitrary and erratic arrests and convictions. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Wyoming has followed the constitutional guideline that a criminal statute violates an essential principle of due process if

" '[m]en must necessarily guess at its meaning and differ as to its application.' *Sanchez v. State*, Wyo., 567 P.2d 270, 274 (1977)."

This court clearly set out these requirements in *State v. Gallegos*, Wyo., 384 P.2d 967 (1963), summarizing the analysis of *Day v. Armstrong*, Wyo., 362 P.2d 137 (1961), which has since been regularly followed:

"1. The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well-established element of the guarantee of due process of law.

"2. No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.

"3. All are entitled to be informed as to what the state commands or forbids.

"4. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

"5. The constitutional guarantee of equal rights under the law (see Art. 1, §§ 2 and 3, Wyoming Constitution) will not tolerate a criminal law so lacking in definition that each defendant is left to the vagaries of individual judges and juries." *State v. Gallegos*, Wyo., supra, 384 P.2d at 968.

See also *Newton v. State*, Wyo., 698 P.2d 1149 (1985); *Armijo v. State*, Wyo., 678 P.2d 864 (1984); and *Dover v. State*, Wyo., 664 P.2d 536 (1983).

The Supreme Court of Louisiana recently restated the above principles in *State v. Griffin*, La., 495 So.2d 1306, 1308–1309 (1986):

"Attacks on the constitutionality of a statute may be made by two methods. The statute itself can be challenged, or the statute's application to a particular defendant can be the basis of the attack. Possible constitutional challenges may be based on either 'vagueness' or 'overbreadth' grounds. * * *

"A statute would be void for vagueness when it does not give 'a person of ordinary intelligence ... fair notice of what conduct is forbidden....' [Citation.] The requirement of lack of vagueness or definiteness is derived from the due process clauses of the United States and Louisiana Constitutions * * *. Under these provisions, a criminal statute must meet two requirements in order to pass constitutional muster. First, it must give adequate notice to individuals of the

conduct which is proscribed and punishable by law. Second, adequate standards must be provided for those charged with determining the guilt or innocence of the accused. [Citations.]"

See also *Commonwealth v. Stenhach*, 356 Pa.Super. 5, 514 A.2d 114 (1986).

Section 6–2–303(a)(vi), W.S.1977 makes it criminal for any person in a position of authority over a victim to use that position to cause the victim to submit. "Position of authority" is further defined as:

"* * * [T]hat position occupied by a parent, guardian, relative, household member, teacher, employer, custodian and [or] any other person who by reason of his position is able to exercise significant influence over a person." Section 6–2–301(a)(vi).

The State did not rely separately on appellant's position as a teacher, although that relationship was obviously a factor in appellant's status. Rather, the State prosecuted and appellant was convicted under the last phrase of the definition: "any other person who by reason of his position is able to exercise significant influence over a person." It is this phrase which appellant challenges for vagueness.

Appellant argues that under this statute it is a crime for anyone to convince another to have sex with him by using emotional involvement, and extends this construct to apply to numerous hypothetical situations, including the marriage relationship. We do not find appellant's characterization of the law persuasive, since common sense will be applied by this court to the statutory language. *Dover v. State*, supra.

First, this court follows the principle announced by the United States Supreme Court in *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), that "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *Sorenson v. State*, Wyo., 604 P.2d 1031, 1034 (1979); *Sears v. State*, Wyo., 632 P.2d 946, 951 (1981).

This case involves a very young woman, then in high school, who was in large part controlled by the attention and demands of appellant as her teacher, coach and confidant. It is not necessary, nor does the law permit us to examine the constitutionality of the statute by inventing situations in which the law's application might seem absurd or invalid. *Sanchez v. State*, supra, 567 P.2d 270; *In re Romer*, Wyo., 436 P.2d 956 (1968).

Second, the words employed by the legislature in announcing the law must be given their plain and ordinary meaning. *McArtor v. State*, Wyo., 699 P.2d 288, 292 (1985); *Hurst v. State*, Wyo., 698 P.2d 1130 (1985). It is helpful to look to Burton's Legal Thesaurus, which defines authority as: "[J]urisdiction, legal power, legitimacy, prerogative, right to adjudicate, right to command, right to determine, right to settle issues, rightful power." Black's Law Dictionary, 5th ed. (1979) defines authority as: "Permission. Right to exercise powers; to implement and enforce laws; to exact obedience; to command; to judge. Control over; jurisdiction. Often synonymous with power."

From these sources it is apparent that the legislature used the word "authority" to mean an externally granted power, not a self-generated control. One in a position of authority is a person who acquires that status by virtue of society and its system of laws granting to him the right of control over another. For example, society grants to a jailer power over his prisoner, and, therefore, the jailer is in a position of authority over the prisoner. Likewise, the teacher or coach is vested with power by a grant from society. The legislature enacted the statute to prohibit persons in such positions of authority from using those positions to cause any individual who might be subject to authoritative power to submit to sexual acts.

In this case, appellant was the victim's teacher and coach. As reposed in our educational system, society vested him with an authoritative status over her. Even though, in the criminal prosecution, the

State did not rely on his employment as a teacher, his authority devolved from that ascribed status.

Appellant, however, seems to argue that his position as a teacher is somehow separable from his holding a position of authority. We think it is not. The State's structural positing of this case, in not relying on the fact that appellant was a teacher to show that he was in a position of authority over MBS, does not somehow negate the fact that appellant indeed occupied that position. Absent the fact that appellant was the victim's teacher, none of the events for which appellant was charged and convicted would have occurred. In light of these facts, we decline appellant's invitation to strike the statute as void for vagueness. A plethora of trial evidence comprehensively demonstrated that appellant was in a position of authority over MBS. A person of ordinary sensibilities in appellant's position clearly should have known that his conduct was forbidden.

## II

Course-of-activities evidence: Introduction of testimony concerning appellant's teaching and coaching methods and his influence over students other than the two alleged victims violated the Wyoming Rules of Evidence, and deprived appellant of a fundamentally fair trial.

The State presented extensive evidence about appellant's behavior toward his students, and particularly toward his "favorites" on the volleyball team. Several of the young women on the team testified about the games the team members and appellant played on the bus when traveling to compete. The games included, among others, "blue dot" (thumping another's forehead with a knuckle to create a bruise), "Texas brain finders" (twisting a knuckle into another's temple), and "snuggies" (reaching into another's pants and pulling up her underpants). When the team was on the road at away games appellant spent considerable time in the young women's motel rooms, kissed some of the team members good-night and "tucked them in." The team members also testified about how appellant favored certain of the young women (particularly the victims) with his attention and affections, and how he sat with them and held their hands. Other testimony included appellant's habit of walking into their locker room while the young women were dressing, general comments about how they trusted and respected him, how appellant made them feel comfortable around him, and how his intimacy with them and casual attitude around them fostered their trust and cultivated his influence.

Appellant contends that any testimony concerning his interactions with other students and their impressions of his general conduct was irrelevant. He argues further that the testimony was highly prejudicial, and its admission deprived him of a fair trial.

Rule 402, W.R.E. provides that generally "[a]ll relevant evidence is admissible *." Rule 401, W.R.E. states that relevant evidence

"* * * means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The State was required to prove that appellant possessed significant influence over MBS and KR in order to establish his position of authority. This was pursued at trial by the testimony of the other observing team members. The fact that when the team was on the road at away games appellant "tucked the girls in," lay on the bed with them, and kissed them good-night while in their motel rooms, and that the high school girls (including the victims) were comfortable with that behavior, is highly relevant to show the enormous extent of his influence, and demonstrates the status and stature appellant enjoyed with regard to the victims. Undoubtedly, appellant could not have structured the same influence and authority if he had associated with his students only in a normal classroom situation.

It was not improper to admit evidence regarding the general state of affairs and relationship between appellant and his team of which the victims were members. One can hardly separate appellant's actions with regard to the victims from those events and behaviors which occurred before the entire team. The victims were usually present and influenced by the activities about which the team members testified.

The evidence involved appellant's relationship to his volleyball team, particularly the victims, and was relevant to appellant's influence, position of authority, and his use of that position. Some of the witnesses told about their perceptions of and reactions to appellant's behavior. Merely because some of the testimony did not directly relate to the victims' perceptions does not mean that the testimony is irrelevant to proving the influence and position of authority he held as to them. Certainly the jury could draw reasonable inferences about appellant's influence over the victims from the general testimony of the other members of the volleyball team. This evidence was not unfairly prejudicial, although often casting appellant in a negative light. That the testimony of the witnesses for the prosecution reflects negatively on the appellant is hardly to be unexpected. But where, as here, that testimony is relevant to proving an element of the crime, its probative character justifies its introduction.

■ Appellant also asserts that the broad admission of his conduct as a teacher and coach is inadmissible evidence of other bad acts, properly excluded under Rule 404(a), W.R.E. We disagree. The testimony essentially involves appellant's course of conduct as specifically related to the charges against him, and is admissible under Rule 404(b), W.R.E. *Crozier v. State*, Wyo., 723 P.2d 42 (1986). The testimony does not bear upon separate criminal occurrences or bad acts. Rather, it is helpful to explain what happened between appellant and his victim, and is integral to understanding the context of the crime charged.

*State v. Beck*, 151 Ariz. 130, 726 P.2d 227 (App.Ct.1986); *State v. Rupp*, Minn.App., 393 N.W.2d 496 (1986). In some jurisdictions it is defined as the evidence of the *context of the offense* and consequently admissible with the reasoning that "events do not occur in a vacuum and the jury has the right to have the offense placed in its proper setting." *Mann v. State*, Tex.Cr. App., 718 S.W.2d 741, 744 (1986).

We find appellant's general behavior toward and relationship with his student athletes admissible because it is integrally related to the State's proof that he occupied a position of authority over MBS and KR as the situational relationships that existed at that time and place. This is not bad-acts evidence of unrelated events.

The trial court admitted the testimony under Rule 404(b), W.R.E., as evidence tending "to show a motive or a plan on the part of the Defendant." In accord with *Crozier v. State*, supra, we define this evidence as the appellant's course of conduct. As such, it is properly admissible, and we find that it did not deprive appellant of a fair trial.

### III

Sex-offense expert testimony: Admission of Detective Reikens' testimony about the range of responses she encountered as a police officer investigating sexual-abuse and sexual-assault cases constituted error.

■ Detective Donna Reikens of the Cheyenne Police Department investigated the allegations made by MBS and KR against appellant, and then testified not only about her interviews with the victims and appellant, but also about her experience with the range of responses victims generally exhibit in response to sexual assault or abuse. She stated that the victims she had encountered often delayed reporting sexual abuse or assault. Appellant claims that this latter testimony is improper because it is inadmissible testimony regarding rape-trauma syndrome, and, further, that Detective Reikens is not a psychologist or psychiatrist and would not be

qualified to give such testimony even if it were admissible. In order to accurately evaluate Detective Reikens' testimony, it is helpful to more completely set forth the nature of her testimony and the parties' positions with regard to its admissibility. The following portions of the trial transcript are beneficial:

"Q. (By Mr. Forwood) Based on your experience, when does a victim report a crime?

"A. Based on my experience, I can recall out of all of the cases that I have worked, one person that reported the crime, a child, that reported the crime immediately following the incident. Other than that, it may be years. It may never be reported.

"Q. So silence is a reaction you see by the victim?

"A. I refer to it as secrecy, yes.

\* \* \* \* \* \*

"Q. (By Mr. Forwood) Based on your experience with these victims that you have talked to, have you interviewed them as to why they have remained quiet?

"A. Yes.

"Q. Approximately how many victims are we talking about that you have interviewed as to why they kept quiet?

"A. That's something that I ask almost all of them.

"Q. How many victims are we talking about that you have interviewed in your sexual assault investigations?

"A. Over 200.

"Q. Based on this experience that you've had in the field of interviewing victims that have remained silent after the assault, why is that? What is the typical reason you hear?

"A. It's usually a multiple reason of fear, and many times guilt. And the fears vary. Or they may all—one person may experience all the same. Some of the fears are a fear that if she says anything the offender may go to prison. Another fear is that she may be alienated from her family. That is typically true in intrafamily sexual abuse type cases.

"She may have fear which is instilled simply by the perpetrator that he has threatened to do some type of harm to her. Another fear is that she will break up the family, and that being the family of the perpetrator, whether that's her own family or whether that would be another family, one that she is not related to. However, I have definitely found that the biggest fear that any of the girls or children have is that they will not be believed.

\* \* \* \* \* \*

"MR. KLINE: Your Honor, at this point we would like a continuing objection to this line of questioning and move that the previous testimony be stricken. There's been no showing that this witness is an expert with regard to the counselling or therapy or treatment of rape victims. She is a police detective, an investigator. There are rape crisis advocates. There are counsellors of that sort that deal in this all the time and are experts.

\* \* \* \* \* \*

"MR. FORWOOD: Your Honor, the State would submit that the evidence is highly relevant. We've offered Donna Reikens as the main investigative officer not only in this jurisdiction, but primarily in this state dealing with what she has found to be as a result of her investigations in interviewing victims and perpetrators.

"We are offering her testimony to the Jury to aid the Jury in understanding why victims react as they do. Why they remain silent. Matters that are very material to this particular case.

"I would submit to the Court that we have gone through the foundation of Detective Reikens' expertise, the hours she's had, the courses she's attended, the places she has instructed. I would submit to the Court she is qualified to render this opinion to the Jury. It is a specialized area outside the common expertise of most jurors and an area that is

important in this case to understand the whys.

"I would submit to the Court we have stayed with 'based upon her experience.' We have not gone into theories of someone else. We have not offered her as a psychologist to explain what goes on in a victim's mind as diagnosed under the DSM III or whatever else. We're utilizing her as an investigator in this area with specialized knowledge that quite frankly no one but investigators in this area have. And unless that information is put before the Jury they don't have the requisite tools to understand why."

The trial court responded by first outlining the criteria for the admissibility of expert testimony under Rule 702, W.R.E., as set forth in *Buhrle v. State*, Wyo., 627 P.2d 1374 (1981):

" ' * * * The subject matter must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman.' "

The trial court stated further that

" * * * 'the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for the truth.' "

Based on these criteria, the court ruled that

"Here this witness is testifying about her expertise as a police investigator for the Cheyenne Police Department specializing in the area of child sexual abuse.

\* \* \* \* \* \*

"In this case, the benefit of her experience in approximately 200 cases is and could be of great benefit in assisting the Jury in understanding the background of these types of cases and the special materials in handling that may be necessary to try them.

\* \* \* \* \* \*

" * * * I find that some of the testimony here generally is of assistance, but I have great concern. I don't think this witness is qualified by way of expertise to provide any testimony of what went

on in the minds of the girls. I think she *is* capable of testifying from her interviews that there is a range of responses in terms of why people do not report a case. [Emphasis added.]

\* \* \* \* \* \*

"I don't think she has even given a satisfactory basis by way of expertise or training or anything else to establish that she knows how the typical victim would react or be able to give that opinion. However, she is able to give a range of responses which she has testified to."

Detective Reikens then testified further, drawing generalized conclusions about victim and perpetrator behaviors based on her extensive experience and research in the areas of sexual abuse and sexual assault. Detective Reikens never testified about whether or not she thought that MBS or KR fit the pattern of behaviors she outlined. It is clear, however, that her testimony was offered to rebut the implication by the defense that the victims' delay in reporting the incident was inconsistent with their claims of nonconsensual sexual relations.

This court has previously ruled that this type of expert testimony about the behavioral characteristics of victims is admissible. In *Lessard v. State*, Wyo., 719 P.2d 227, 233–234 (1986), we considered similar testimony:

" * * * The expert * * * testified that most rape victims at some point ask their assailant not to tell. The witness then gave her opinion of why victims usually do this. * * * [T]he trial judge permitted the expert witness to testify on the basis of her specialized knowledge in order to assist the jury to understand one aspect of the evidence. That was a matter which had troubled both the prosecutor and the defense counsel, i.e., why would a victim ask the assailant not to tell about the sexual encounter."

We found no abuse of discretion in the admission of that testimony, and likewise we find no abuse of discretion in the trial

court's admission of Detective Reikens' testimony here. Our conclusion in *Lessard*, that relevant expert testimony about the behavioral characteristics of victims is admissible, is dispositive.

We are also persuaded by the holding in *State v. Sandberg*, Minn.App., 392 N.W.2d 298 (1986) (review granted October 17, 1986). In that case the court held that an experienced police officer's expert testimony on the psychological, emotional and behavioral characteristics of minor victims of sexual abuse was proper. That court stated:

"* * * [T]he record shows the police officer was experienced with the reporting practices of abused children. * * * His testimony concerned primarily statistical reporting practices of minor victims, rather than the psychological evaluation of the victim's behavior. The officer also testified that the 13-year-old complainant's failure to report the incident to authorities was not unusual. Under these circumstances, we conclude that the trial court properly exercised its discretion in qualifying this police officer as an expert for the purpose of testifying about reporting practices of victims of sex crimes." 392 N.W.2d at 302–303.

We note that the Minnesota Court of Appeals which decided *Sandberg* did not feel constrained to exclude this expert's testimony by the Minnesota Supreme Court's unequivocal rejection of the admissibility of rape-trauma-syndrome testimony in *State v. Saldana*, Minn., 324 N.W.2d 227, 229–30 (1982).

Detective Reikens' expert testimony was not testimony regarding rape-trauma syndrome, and therefore we do not now decide whether such testimony is admissible. In any event, the admissibility of rape-trauma testimony must be carefully confined to avoid jury convictions based not on what the direct evidence shows occurred, but on expert opinion. *United States v. Azure*, 801 F.2d 336 (8th Cir.1986); *People v. Koon*, Colo.App., 724 P.2d 1367 (1986).

Detective Reikens did not testify about the victims' states of mind, expressed no opinion whether the victims were suffering from rape-trauma syndrome, and, in fact, never mentioned rape-trauma syndrome. She did testify about the range of responses to sexual assault that she had encountered, and the trial court properly limited her testimony to her experience. While the victims' reactions about which she testified may be consistent with the behavior of one suffering from rape-trauma syndrome, her testimony was not rape-trauma-syndrome testimony. The difference is between generalized expert testimony about behaviors common to a class, and an evaluation of the actions of an individual complainant. *United States v. Azure*, supra. For an excellent discussion of rape-trauma syndrome testimony see Comment, *The Use of Rape Trauma Syndrome as Evidence in a Rape Trial: Valid or Invalid?*, 21 Wake Forest L.Rev. 93 (1985).

Detective Reikens' testimony was proper in this case. Her experience and expertise in the area of sexual abuse and sexual assault were extensively presented; she testified about the knowledge she acquired in her field and gave the jury general information based on her investigative experience from which the jury could infer that the victims' delay in reporting the sexual assaults was not inconsistent with their claims that they had been assaulted. This sort of expert testimony which serves to rebut a defendant's assertions that delay in reporting sexual assault is inconsistent with its occurrence is admissible in Wyoming. *Lessard v. State*, supra. See also *People v. Bledsoe*, 36 Cal.3d 236, 203 Cal. Rptr. 450, 457, 681 P.2d 291, 298 (1984), in which the California Supreme Court stated that this kind of testimony

"* * * may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths."

Admissibility of evidence is generally within the sound discretion of the trial court, and decisions will not be overturned absent clear abuse of discretion. *Lessard*

*v. State*, supra, 719 P.2d at 234; *Stamper v. State*, Wyo., 662 P.2d 82 (1983). We find no abuse of discretion. The trial court properly found the expert testimony beneficial, and appropriately limited it to providing a general context in which the jury could more knowledgeably address the issues with which it was presented.

## IV

Motion for a mistrial: Denial of appellant's motion for a mistrial was unjustified in light of Ms. Hoxey's improper testimony as the State Crime Laboratory specialist, regarding the 38 undesignated pubic hairs found in the school closet where admitted sexual activity occurred.

In the course of the investigation, Janelle Hoxey from the State Crime Laboratory examined pubic hair exemplars obtained from appellant and the two victims. She compared the exemplars to the hairs taken from the carpet and from a pair of semen-stained shorts found in the school volleyball closet where some of the sexual activity occurred. Ms. Hoxey was qualified as an expert forensic scientist in the area of serology and trace evidence. She testified that (1) she found 19 pubic hairs from the carpet that were similar in microscopic characteristics to appellant's pubic hairs; (2) there were nine facial hairs from the carpet microscopically similar to appellant's facial hairs; (3) 23 pubic hairs from the carpet were microscopically similar to MBS' pubic hairs; (4) three pubic hairs from the carpet were microscopically similar to KR's pubic hairs; and (5) there were 37 pubic hairs from the carpet and one adhered to a semen stain on a pair of shorts that were microscopically similar to each other but different from the pubic hairs of appellant, MBS, and KR.

Ms. Hoxey testified further about the semen stains on the gym shorts, the witness was tendered for cross-examination,

and the court took its morning recess. The proceedings were reconvened in chambers at defense counsel's request who then formally objected to Ms. Hoxey's testimony about the ·38 similar pubic hairs on the grounds of relevancy, and moved for a mistrial. The court found "that the evidence is not relevant, and in fact invites speculation on the part of the Jury," but denied the motion for a mistrial. Instead, the court ordered Ms. Hoxey's testimony about the 38 pubic hairs be stricken, and directed the jury to disregard it.

Appellant asserts that the State was trying to prove the existence of another unidentified victim, and that such highly prejudicial and inadmissible evidence could not be corrected by mere instructions to the jury to disregard it. He contends that the only proper means to remedy the improper evidence was to grant a mistrial, and that the trial court erred in refusing to do so.

Other than the apparent indication that this closet was a "busy place," we could find the questioned testimony to be neither harmful nor beneficial, but we do agree that the questioned testimony was irrelevant within the context of the lack of foundational evidence. Not, however, until the meeting in chambers, after the recess, did appellant object to Ms. Hoxey's prior testimony. The trial court properly found that the objection was not timely made, and based its refusal to grant a mistrial in part on that fact.[1]

Appellant contends that he "didn't want" to object to Ms. Hoxey's irrelevant testimony to avoid drawing the jury's attention to the potentially prejudicial evidence. We agree with the trial court that appellant's justification for failing to timely object is inadequate. *People v. McNutt*, 146 Ill.App.3d 357, 100 Ill.Dec. 24, 496 N.E.2d 1089 (1986). As a Wyoming trial

---

1. The trial court also pointed out that "the situation is as much a creation of the Defense as it is of the Prosecution." The court was referring to the parties' disputes and inability to cooperate in the discovery process. Conjunctively with the motion for a mistrial, appellant also moved for a motion in limine to exclude further evidence of these pubic hairs. The court granted the motion and ruled that the subject was foreclosed and the jury would be instructed to disregard.

practice, a bench conference is usually available to avoid the prejudicial effect of particularly disturbing evidence if a motion in limine cannot be utilized earlier.

The general rule in Wyoming is that a failure to interject a timely objection is treated as a waiver unless the error is so flagrant as to constitute plain error, thus requiring reversal. *Jeschke v. State*, Wyo., 642 P.2d 1298, 1301 (1982). The plain-error doctrine will only be applied when the appellant clearly demonstrates the violation of a clear and unequivocal rule of law which adversely affects his substantial rights, so that he is materially prejudiced. *Id.*, 642 P.2d at 1301; *Ketcham v. State*, Wyo., 618 P.2d 1356, 1359 (1980).

■■■ Although this part of Ms. Hoxey's testimony might have led to speculation on the part of the jury in perceiving the involvement of another student or perhaps another instructor, we find that the trial court's curative admonition was sufficient to prevent prejudice to a substantial right of appellant. No later testimony was received, nor did the State argue that appellant was somehow linked to the presence of those 38 unknown hairs. In the absence of an attempt to directly link these extraneous and irrelevant hairs to appellant, the initially unresisted evidence revealing the unknown with the known did not materially prejudice appellant. *Ostrowski v. State*, Wyo., 665 P.2d 471, 489 (1983).

> "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Martin v. State*, supra, 720 P.2d at 897.

We conclude that there was no abuse of discretion in denying the mistrial motion at this stage of the trial, and certainly no plain error. The order to strike the testimony, the instruction to the jury, and the refusal to grant a mistrial constitute a proper exercise of the trial court's discretion.[2] *DeSersa v. State*, Wyo., 729 P.2d 662 (1986); *Martin v. State*, Wyo., 720 P.2d 894 (1986); *People v. Roy*, Colo., 723 P.2d 1345, 1348 (1986); *State v. Borchardt*, 224 Neb. 47, 395 N.W.2d 551 (1986).

V

Cumulative evidence: Rejection for introduction of the transcript of MBS' preliminary hearing denied appellant his constitutional right to defend.

■■■ After cross-examining MBS, appellant's counsel offered into evidence a transcript of her testimony at the preliminary hearing. The State objected, and contended that the statements contained in the transcript were not shown to be inconsistent and were not admissible under Rule 613(b), W.R.E. The trial court reserved ruling on the admissibility of the offered transcript. Later, at a hearing in chambers, the trial court admitted a handwritten *statement* by MBS on which she had been cross-examined, but ruled that the *transcript* was cumulative and did not contain anything helpful to the trier of fact.

Appellant contends that the trial court's refusal to admit the preliminary hearing transcript violated his right to defend guaranteed him by the Sixth Amendment to the United States Constitution and Art. 1, § 10 of the Wyoming Constitution. He correctly contends that he has a Constitutional right to " 'a meaningful opportunity to present a complete defense,' " *Crane v. Kentucky*, —— U.S. ——, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986), quoting from *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984), "through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence." *Faretta v. California*, 422 U.S. 806, 818, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975).

---

**2.** An exhibit, which included slides of all the pubic hairs, including the 38 undesignated ones, was introduced into evidence without objection. The diligent cross-examination that followed the denial of a mistrial pursued the expert witness' absence of knowledge about any range of dates relating to the hair particles or specifically how the hair particles got on the carpet.

However, this Constitutional right does not guarantee the opportunity to a criminal defendant to have every tendered exhibit introduced into evidence. We find the reasoning of Judge Wright in *Williams v. United States*, 403 F.2d 176 (D.C.Cir.1968), persuasive. In that case, the appellant argued that the trial court erred in refusing to admit into evidence a witness' written statement which was contendably inconsistent with his later trial testimony. The appellant contended that

"* * * he [was] entitled to the fuller attention the jury might have given to the inconsistency between the statement and the witness' initial testimony if the statement had been admitted and the jury allowed to take it into the jury room." 403 F.2d at 179.

The Williams court, relying on *Gordon v. United States*, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), agreed, but concluded that "the failure to admit [the] prior statement into evidence was not so prejudicial as to require reversal." *Williams v. United States*, supra at 179.

In *Stinehart v. State*, Wyo., 727 P.2d 1010 (1986), this court recently addressed a similar contention that a trial court's refusal to admit the transcript of a prior statement was error. In relying in part on the extensive cross-examination of the victim, the court found that the transcript of the victim's statement was properly excluded as cumulative as well as harmless.

In this case, appellant's counsel extensively examined MBS in his attempt to impeach her testimony with prior inconsistent statements. Counsel began his cross-examination as follows:

"Q. Miss [S] you've given a couple of statements to the police, haven't you?

"A. Yes, sir.

"Q. One on the 4th of January and one on the 7th of January; isn't that true?

"A. Yes.

"Q. You've also been through a preliminary hearing in this matter; isn't that true?

"A. Yes.

"Q. And you have told the story under oath at that time, didn't you?

"A. Yes.

"Q. Or a version of the facts?

"A. Yes.

\* \* \* \* \* \*

"Q. You told a different version each time, haven't you?"

Appellant's counsel then asked questions about the differences and omissions in the prior statements. During cross-examination the witness was presented with her handwritten statement, but was never presented with a copy of the preliminary hearing transcript. Counsel did ask her, however, to explain the fact that her testimony at trial included details about which she did not testify during the preliminary hearing. Appellant's counsel pointed out on numerous occasions that MBS' testimony at trial was not entirely consistent, identical to, or as complete as her testimony at the preliminary hearing.

The court in *Stinehart* said:

"Even assuming a finding by this Court that the transcript was improperly excluded, we would find the error harmless under the circumstances of this case and affirm appellant's conviction. In order for an error to be regarded as harmful, there must be a reasonable possibility that in the absence of the error, the verdict might have been more favorable." *Stinehart v. State*, supra, 727 P.2d at 1016, citing *Bishop v. State*, Wyo., 687 P.2d 242 (1984), cert. denied 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985).

It is difficult to conceive how, in the case at bar, the verdict possibly could have been more favorable had the transcript of the preliminary hearing been admitted. First, the inconsistencies contained therein were clearly presented to the jury. And second, the text of that hearing was even less restrained in its inculpatory detail than was the vividly explicit testimony at the trial

itself.[3] As this author stated in his concurrence in *Stinehart:*

"* * * The only way that availability of the document for jury-room deliberations could have delayed the conviction verdict would arise from time invested in their reading its explicitly detailed text." 727 P.2d at 1018, Urbigkit, J., concurring.[4]

## VI

Sufficiency of the evidence: There was insufficient evidence to support appellant's conviction.

The jury convicted appellant of committing second degree sexual assault on December 28, 1983. Appellant contends that the only testimony on point concerned an incident on December 26, 1983, and that there was no testimony regarding any sexual contact between appellant and the victim on December 28. He also asserts that there was no testimony concerning appellant's use of substantial influence on December 26 to cause MBS to submit.

Under the circumstances of this case, we refuse to reverse appellant's conviction because of a two-day discrepancy in the jury verdict form and the testimony at trial. This court recently affirmed a conviction where the notice and sufficiency of the indictment was clearly more questionable. *Stewart v. State,* Wyo., 724 P.2d 439 (1986). See also *Marshall v. State,* Minn. App., 395 N.W.2d 362 (1986); *State v. Wehrle,* 223 Neb. 928, 395 N.W.2d 142 (1986); *In re K.A.W.,* 104 N.J. 112, 515 A.2d 1217 (1986).

The fourth count with which appellant was originally charged was second degree sexual assault on December 28, 1983. In April of 1985 the State filed and served appellant with an Amended Bill of Particulars, in which the date of that count was changed from December 28, 1983 to December 26, 1983.

On direct examination the victim testified as follows:

"Q. Did you have sex with Bryan Scadden after the 21st of December at school?

"A. Yes.

if I would go over and talk to him. And I said fine and he said that he would get me out of school, that he'd call to the office and just say that he was my dad and that I had an appointment. So I went down to the Junior office, well I had to call him back, you know, and say that it was my dad and he told them that he was my dad and that I had an appointment and then I left and I went to his house.

\* \* \* \* \* \*

"A. We watched TV for a while and then I had my arm like laying off the edge of the couch and he held my hand for a while and then he pulled me over the couch and he kissed me and then he said, I asked him what was wrong, and he said that he didn't know, he was just feeling down and he had been throwing-up all night and all this stuff.

\* \* \* \* \* \*

"A. He, you know, kept kissing me and everything and then he laid down on the floor and he pulled me on the floor with him \* \*."

---

**3.** For example, MBS' testimony in the proposed exhibit included the following:

"Q. So you went over there at his request on that afternoon. When you got there that afternoon what happened?

"A. I was in his house, in his living room. We were sitting on the couch and he, he just, he started to kiss me and I just really didn't know what to do. I was very, you know, all this time this man, you know, my volleyball coach, I had always trusted him. I just thought, I couldn't believe that he would do this. I thought, why me, you know, why would he do this and I was just kind of frozen, you know. And he, it just progressed, you know, he would kiss me and I would kind of push away and he just, he was very persistent. And he, um, he put me on the floor, you know, he kind of picked me up and put me on the floor.

"Q. From the couch to the floor?

"A. Yes, and was kissing me. He was on top of me and he would put his hands up my shirt, or he undid my bra and, um \* \* \*."

KR similarly narrated, as found in the proposed exhibit:

"A. I was at school and I got a message in my second hour class to call him at home. And I went down to the Junior office and I called and he told me that he was feeling sick and really depressed, you know, and he asked

**4.** This author's special concurrence, written in contemplation of the case at bar, remains unadjusted. This is not to suggest as a non-discretionary principle that whatever is introduced into evidence need necessarily be sent into the jury room for consideration during deliberations.

"Q. When then?

"A. It was—The best I can recall immediately after Christmas.

"Q. December 26th?

"A. (Witness nods head.)

In his testimony appellant acknowledged having sex with MBS 40 or 50 times. He did not present an alibi defense; he agreed that the sex occurred.

██ Rule 9(a), W.R.Cr.P. states in relevant part:

"Error in the citation or its omission *or any other defect or imperfection which does not tend to prejudice any substantial right of the defendant* upon the merits or to mislead the defendant to his prejudice shall not be grounds for * * * reversal of a conviction." (Emphasis added.)

The policy of the rule "is that imperfections of form which are not prejudicial are disregarded." *State v. Faltynowicz*, Wyo., 660 P.2d 368, 371 (1983). We fail to see how appellant was prejudiced by the failure to correct the jury form to conform to the Amended Bill of Particulars and the testimony at trial. The imperfection does not amount to an insufficiency of the evidence.

██ Appellant's second assertion, that the evidence regarding his influence over MBS on December 26, 1983 was insufficient, fails as well. In reviewing the sufficiency of the evidence to support a criminal conviction, this court examines all the evidence in the light most favorable to the state. *Dangel v. State*, Wyo., 724 P.2d 1145, 1148 (1986); *Aden v. State*, Wyo., 717 P.2d 326, 327 (1986); *Broom v. State*, Wyo., 695 P.2d 640 (1985).

" 'In reviewing the sufficiency of evidence in a criminal case, this court makes a painstaking review of the record to determine if the evidence is sufficient to permit the jury to reach the conclusion that it did. [Citation.] The court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a defendant was proved guilty of the offense charged. [Citation.] The court considers the evidence in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it reached. [Citation.]' *State v. Richardson*, Minn., 393 N.W.2d 657, 661–662 (1986)." *DeSersa v. State*, supra, 729 P.2d at 664.

The State presented extensive evidence of the continuing nature of appellant's influence and authority, and his use of that influence and authority to cause MBS to submit to sexual intrusion. The victim, MBS, also testified extensively about the influential tenor of appellant's position over her and the threats he used to cause her to submit to sex. Her testimony included the following:

"A. * * * [H]e was controlling me more and more, monitoring what I did * * *.

* * * * * *

"Q. Were you afraid of anything besides being physically hurt?

"A. Yes, I was afraid of him taking advantage of his coaching and teaching position over me.

"Q. What do you mean by that?

"A. Well, messing up my chance to have a scholarship or messing up my grades * * *.

"Q. You said you were afraid of him as a teacher. What could he do to you as a teacher?

"A. He could give me grades that were different from what I had earned. Poor grades.

* * * * * *

"Q. Did you think of telling anyone?

"A. I wanted to, but I—I didn't want to because I was afraid.

"Q. Afraid of what?

"A. Well, * * * I was afraid that no one would believe me * * *.

* * * * * *

"Q. Why did it go on? Why did you let it go on?

"A. * * * I didn't have anyone to tell. I couldn't tell my parents. And I was

more and more afraid of him because after a few times that had happened, he began threatening me.

"Q. What were those threats that he started using?

"A. Well, he never really—He never really threatened me, 'If you don't have sex with me.' It was if I made any hint of trying to get away from him or trying to break away from him he would say, 'Okay. Go ahead. That's fine with me. But I'm going to make life hell for you.'

"Q. What did that mean to you when he said that?

"A. It meant everything that I've described. Scholarship, grades could get ruined. I didn't want my parents to find out.

\* \* \* \* \* \*

"Q. Did you feel you had any control over your own life then?

"A. No, I was basically doing everything he wanted me to do."

With regard to the sexual assault on December 26, 1983 for which appellant was convicted, the victim testified on direct examination:

"Q. Where at then?

"A. At school.

"Q. How did you have occasions to be up at school then?

"A. He would call me and ask me to come up there.

"Q. Why would you go.

"A. Because of the threats and because I was frightened of him. It was still the same thing. It had never stopped."

We conclude that the evidence of appellant's influence over MBS was sufficient to support appellant's conviction of second degree sexual assault.

## VII

Instructions: Refusal to give the jury Instruction 14 and appellant's proposed Instructions A and B was error.

Appellant's objection and comment regarding jury instructions consisted of the following:

"We have no objections, Judge, with respect to any of the instructions that you have proposed. The only objection, I guess, I would have is to the removal of Proposed Instruction 14. If it is not given, I guess, I would request an instruction coming from *McCarter (phonetic) vs. State* or something similar indicating that force or a substitute for force is required in each of those specific instances. We would also, of course, offer those two instructions that we previously gave to the Court."

The general rule in reviewing questions involving instructions is that the trial judge is afforded latitude to tailor the instructions to the facts of the case, and reversible error will not be found as long as the instructions when viewed as a whole and in the context of the entire trial fairly and adequately cover the issues. *McDonald v. State*, Wyo., 715 P.2d 209 (1986); *Ostrowski v. State*, supra, 665 P.2d 471; *Jeschke v. State*, supra.

 Instructions A and B offered by appellant both involve the issue of consent. The trial court did instruct the jury that lack of consent is an element of second-degree sexual assault (Instruction No. 9) and that consent is a defense to the charge (Instruction No. 11). The court also set out the standard to show lack of consent in Instruction No. 12. The trial court's instructions adequately covered the issue of consent, and its refusal to give the requested instructions is not error.

 The trial court's initially proposed Instruction No. 14, to which the State had objected, stated:

"An actor will be justified in assuming the existence of voluntary consent if the conduct of the alleged victim toward the actor at the time of the occurrence creates an honest and reasonable belief that the victim has consented by yielding her will freely to the commission of the act."

As explanation for removal, the trial court said:

" * * * I have decided to remove what I'd previously put in instructions as In-

struction No. 14 which discusses a reasonable belief that the victim has consented by yielding freely to commission of the act. I don't think it's a bad instruction, but I think it is a matter of argument. And certainly it can be argued by the—both sides in this case. That there was a reasonable belief on the part of the Defendant that there had been a yielding—free yielding to the commission of the act. This case is focusing in on the consent aspect and those instructions will remain."

After this comment, appellant objected to the trial court's refusal to give the instruction. We conclude that the trial court provided adequate instruction regarding consent in the context of the position-of-authority stature of the criminal prosecution. Furthermore, Instruction No. 12, as given, more relevantly stated:

"You are instructed that the standard to show a lack of voluntary consent is a relative one. The victim is not required to do more than her age, strength, surrounding facts, and all attending circumstances make it reasonable for her to manifest opposition."

We find no error in the instructions as given or refused.

## CONCLUSION

We have considered appellant's attack on the validity of the statute under which he was convicted, as well as his many contentions that errors in the proceeding deprived him of a fair trial. None of the issues raised requires this court to reverse. Nor do we agree that this case presents sufficient imperfections, the cumulative effect of which might otherwise justify reversal.

Affirmed.