John MILLER, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 87–19.

Supreme Court of Wyoming.

May 6, 1988.

Wyoming Public Defender Program, Leonard D. Munker, State Public Defender, and Julie D. Naylor, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Sylvia Lee Hackl, Sr. Asst. Atty. Gen., Cheyenne, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

BROWN, Chief Justice.

Appellant John Miller was convicted by a Laramie County jury of being an accessory before the fact to the crime of first-degree murder. He was sentenced by the court to life in prison.

On appeal appellant raises five issues:

I

"Did the district court err in refusing to allow Dr. Roach to testify.

II

"Did the district court err in allowing the prosecution to introduce evidence of check fraud when Appellant was never charged with check fraud.

III

"Did the district court err in refusing to properly instruct the jury on the defense of insanity.

IV

"Did the district court err in refusing to instruct the jury on the crime of accessory after the fact.

V

"Did the district court err in refusing to instruct the jury on the lesser included offense of manslaughter."

Damon Runyon would have been hard pressed to improve on the cast of characters in this human tragedy. So far as this case is concerned, John "Bulldog" Miller, appellant, and the late Laurence "Diggie" DeGroff, the victim, were the principal actors. The supporting cast consisted of Leland "Yosemite" Brown, Robert "Troll" Davis, John "Lizard" Kasselder, Richard "Chainsaw" Leonard, and Sherry (No Nickname) Newell. The principal actors were unproductive members of society, and both were recipients of the largess of the federal government. Diggie's entitlement

checks were not insubstantial, and some of his friends, with strange sounding names were wont to take advantage of him and help redistribute his wealth. The deceased might be characterized as the "goose who laid the golden egg."

Before July of 1985, Diggie lived with two men known as Tramp and Stash, who relieved Diggie of most of his money as fast as it came in. In the latter part of July Diggie moved in with appellant and his girlfriend.

A typical "down-home" day in the life of "Bulldog" Miller is described in his brief: " * * * He would get up at 8:00 a.m., have breakfast, then ride his motorcycle till about 11:00 a.m.; then he would stop at the Eagle's Nest bar for a few beers (five or six); then he would ride his motorcycle until about 6:00 p.m. when he would have dinner; next he would ride his motorcycle some more and then go to the Mayflower or the Eagle's Nest and drink whiskey and beer until closing time, 2:00 a.m.; last he would ride his motorcycle home."

October 2, 1985, started out as a typical day in the life of appellant. Diggie De-Groff had just received a check and his friends with sub-culture "handles" were at the premises occupied by appellant and Diggie to help Diggie reduce his cash balance.[1] At the party alcohol flowed freely; Lizard Kasselder and Diggie threw a few punches. Lizard slammed Diggie's head into the wall, denting the wall, but not Diggie's head. At this juncture, a girl named Sue, exhibiting considerable foresight and good judgment, hustled Lizard away from the party.

The drinking continued unabated, whereupon Diggie announced that he had to throw up, so he repaired to the bathroom and did that. Next, Yosemite Brown stopped drinking for a few moments, went into the bathroom and stabbed Diggie a couple of times with his buck knife. Diggie's reaction was to yell "ouch." Yosemite returned to the scene of the drinking

and announced that he had just stabbed Diggie. Appellant said to Yosemite, "Well you started it, finish it." Whereupon, Brown, Yosemite, that is, headed for the bathroom mumbling something about stabbing Diggie again or slitting his throat. Brown returned and said he had stabbed Diggie again. The conversation then shifted to a discussion about a check Diggie had just received, which led to a decision that Diggie should be forced to sign the check so that it could be cashed. Yosemite, Troll and Bulldog (appellant) returned to where Diggie lay, bleeding and moaning and forced him to endorse the check. Diggie had blood on his hands, and stained the check. The threesome returned to the kitchen table to decide whether the check could be cashed. Sherry (No Nickname) Newell, girlfriend of appellant, attempted to clean the blood off the check, but tore it in the process. The check was then ripped up and tossed into the fireplace. Appellant was angry that the check could not be cashed; after sending Sherry into the bedroom, he walked over to Diggie and stabbed him.

Diggie died around 9:15 p.m. He sustained about twenty stab wounds, any one or all of which could have been fatal. Appellant then suggested that Diggie's hands and head be chopped off to prevent identification. The corpse was pulled into the bathtub to allow the blood to wash down the drain. Either Yosemite or Troll hacked off the right arm. Bulldog then sent Sherry into town to get Chainsaw Leonard and to buy firewood. The two stopped at a convenience store where Chainsaw purchased the firewood. Sherry returned with Chainsaw about 11:00 p.m. When Chainsaw walked in, he saw Troll kneeling by the fireplace, holding a butane torch and using it to burn something. Chainsaw peered into the fireplace, and saw " * * * a human hand in there burning." He then glanced into the bathroom where Yosemite stood with a butcher knife. Chainsaw saw Diggie lying in the tub, and " * * * the

---

1. Actually, Diggie did not receive his checks directly from the federal government, but rather through a conservator.

stump of bloody arm sticking out of the bathtub. * * *"

Appellant used the wood Chainsaw brought to fuel the fire. Appellant hacked off Diggie's left hand, tossed it into the fireplace. He and Troll then undertook the tedious job of decapitating Diggie. They took turns slicing with the butcher knife. Appellant testified: "I'd go out and drink and he'd [Troll] chop, and then I'd go in and chop and he'd drink * * *." Appellant finally removed Diggie's head, holding it by the hair with one hand, while chopping with the other. He put the head in a plastic bag and tossed it into the fire, along with Diggie's clothes and his wallet, saving only the driver's license.

About 4:30 a.m. appellant and Troll shoved the body, sans head and hands, into the trunk of appellant's car. They drove around on the back roads east of Cheyenne looking for a place to hide the corpse. They finally dumped it by a haystack near the Wyoming Hereford Ranch, and then they cleaned up the car and house.

Diggie's checks continued to arrive at appellant's post office box. Since appellant had Diggie's driver's license, he was able to cash the checks. Appellant paid Diggie's bills " * * * to make it look like he was still alive so nobody started asking questions," and then appellant paid his rent and bought groceries. About $400 was left after that, and appellant said he didn't know what he did with it, but " * * * probably drank it up." He used part of the December check for Christmas presents.

The crime came to light when in late January, 1986, Chainsaw Leonard needed a copy of his G.E.D. record for an apprentice training program. Because he had obtained his G.E.D. while incarcerated in a federal penitentiary, he went to the United States Marshal's office to see if they had the information he needed. While at the U.S. Marshal's office he talked to George Stumpf, a deputy marshal whom Chainsaw had known for several years. At one point in the conversation, Chainsaw mentioned that " * * * there's dead bodies out here, and I know where they are and I know who did it. * * *" Mr. Stumpf reported the conversation to Sergeant Bill Null, a Cheyenne Police Department detective. Sergeant Null made arrangements to meet with Chainsaw on January 24, 1986, at which time Chainsaw revealed the details of the murder and led officers to the body.

An autopsy was performed on the decomposed remains, and it was determined that the cause of death was "multiple stab wounds to the thorax and upper abdomen of the body, both from the front and the rear." Since the internal organs were gone "due to insect or animal activity," it was impossible to determine the depth of penetration of any single wound. The pathologist stated, however, that any one or all of the twenty stab wounds could have been fatal.

Before appellant's trial, Leland "Yosemite" Brown pled guilty to first degree murder, and Robert "Troll" Davis entered pleas of guilty to accessory after the fact and mutilation. Both testified at appellant's trial, as did Richard "Chainsaw" Leonard, John "Lizard" Kasselder and Sherry (No Nickname) Newell. Appellant also testified in his own behalf. Sherry testified that appellant did nothing to prevent the murder, which was consistent with appellant's own statements.

On the final day of hearing the evidence the jury learned that Diggie had been murdered, in appellant's words, "For shits and giggles." The next day, the jury found appellant guilty of "accessory before the fact" to the crime of first-degree murder.[2]

I

At his arraignment appellant pled not guilty and not guilty by reason of mental

2. Section 6–1–201(a), W.S.1977 (June 1983 Replacement), provides in pertinent part:
  "A person who knowingly aids or abets in the commission of a felony, or who counsels, encourages, hires, commands or procures a felony to be committed, is an accessory before the fact."

Throughout the proceedings here the terms "accessory before the fact" and "aiding and abetting" are used interchangeably. We attach no significance to this difference.

illness or deficiency. He was initially examined at the Wyoming State Hospital to determine his competency to stand trial. Appellant was subsequently examined by his own doctors, Arthur Merrell and Neal Roach. None of these pre-trial evaluations contained an opinion that appellant was suffering from mental illness or deficiency at the time of the crime. Section 7–11–304(a), W.S.1977 (Cum.Supp.1985), provides:

"A person is not responsible for criminal conduct if at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked *substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.* As used in this section, the terms mental illness or deficiency mean only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable primarily to self-induced intoxication as defined by W.S. 6–1–202(b)." (Emphasis added.)[3]

Section 7–11–305, W.S.1977 (Cum.Supp. 1985), provides in part:

"(b) The prosecution shall prove beyond a reasonable doubt all the elements of the offense charged. Every defendant is presumed to be mentally responsible. The defendant shall have the burden *of going forward and proving by the greater weight of evidence that, as a result of mental illness or deficiency,* he lacked capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. (Emphasis added.)

"(c) The designated examiners who examined the defendant pursuant to W.S.

7.242.3 [7–11–303] or 7–242.4 [7–11–340] are competent witnesses.

"* * *

"(e) Those examiners who examined the defendant may testify as to the nature of their examinations, diagnoses of mental illness or deficiency, and opinions as to the defendant's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. They may also reasonably explain their diagnoses and opinions, and may be cross-examined as to their competence and the credibility of their diagnoses and opinions."[4]

At trial the state contended that appellant could not meet his "* * * initial burden of going forward and proving by the greater weight of evidence that, as a result of mental illness or deficiency, he lacked capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. § 7–11–305(b), W.S.1977. * * *" The state based this contention on the absence in appellant's doctors' reports of an opinion that appellant was suffering from a mental illness or deficiency at the time of the crime. The novel theory of the defense was that "* * * since the ultimate decision on sanity was to be made by the jury, the experts ought to give of their expertise to the jury so that the jury could make that determination, but ought *not* to impose on the jury their ultimate opinion. * * *"

Despite an objection by the state that Dr. Merrell's proposed testimony was irrelevant, he was allowed to testify. During Dr. Merrell's testimony, he stated that he was not going to testify that appellant was suffering from a mental illness at the time of the crime. He testified he did not in-

---

**3.** Section 7–11–304(a), W.S.1977 (June 1987 Replacement) contains identical language.

**4.** Paragraphs (c) and (e) of § 7–11–305, W.S. 1977 (June 1987 Replacement), now read:

"(c) Only the designated examiners who examined the defendant pursuant to W.S. 7–11–303 or 7–11–304 are competent witnesses to testify as to the defendant's mental responsibility.

*     *     *     *     *     *

"(e) The designated examiner who examined the defendant may testify as to and explain the nature of his examinations, his diagnosis of mental illness or deficiency of the defendant, and his opinion as to the defendant's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. The designated examiner may be cross-examined as to his competence and the credibility of his diagnosis and his opinion."

clude in his written report his opinion as to appellant's capacity to understand or control his conduct, because " * * * Mr. Munker [the public defender] asked me not to put that in writing specifically." Later questioning by the court, out of the jury's hearing, revealed that although the doctor was aware of the statutory requirement that he report his opinion regarding appellant's mental capacity at the time of the crime, he did not do so, at defense counsel's request.

Appellant also produced Dr. Neal Edward Roach, a psychiatrist, to testify in his behalf. The state objected to the testimony of Dr. Roach for substantially the same reasons it objected to Dr. Merrell's testimony, that is relevancy. Appellant made an offer of proof as follows:

"Q. Did you find John Miller to have a mental deficiency or a mental illness?

"A. That was my impression, that he had a mental illness, not a mental deficiency.

" * * *

"A. It was my impression that the symptoms of the illness and his family history were most compatible with the diagnosis of Bipolar Affective Disorder, which is a manic depression, and Schizoaffective Disorder. It was my opinion the former term is most appropriate of the two which was Bipolar Affective Disorder or Manic, primarily because the latter term, Schizoaffective Disorder, is kind of a poorly defined psychiatric diagnosis.

"Q. Are those both mental illnesses?

"A. Major mental illnesses, right.

" * * *

"Q. Okay. And do you think he understands the nature and the object of the proceedings against him?

"A. Yes, sir.

"Q. And do you think he has the capacity to appreciate the wrongfulness of his conduct?

"A. Yes, sir.

"Q. Presently?

"A. Yes, sir.

"Q. And do you think he can conform his conduct to the requirements of law?

"A. Yes, sir.

"Q. Can you express an opinion on the night of the homicide?

"A. I can't, I didn't examine him for that."

On cross-examination it was stated:

"Q. Do you have an opinion as to whether or not the Defendant, John Miller, as a result of mental illness or deficiency lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law?

"A. I don't have an opinion on that, sir. I did not examine him to try to determine that. That was not the purpose of my examination."

The trial court rejected the offer of proof and did not allow the testimony of Dr. Roach to be presented to the jury and held that the proposed testimony was cumulative of that of Dr. Merrell and that " * * * It does not appear * * * to meet the statutory requirements. * * * " The latter holding, in context with the facts here, is tantamount to a determination that Dr. Roach's testimony was irrelevant. In his offer of proof, Dr. Roach talks about "chronic psychotic illness," bipolar affective disorder, manic depression, and schizoaffective disorder; however, Dr. Roach declined to give an opinion whether or not appellant "as a result of mental illness or deficiency lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

In *Lessard v. State*, Wyo., 719 P.2d 227, 233 (1986), this court said:

"Expert testimony now is addressed in Rule 702, W.R.E., which provides in pertinent part:

" 'If * * * specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert * * * may testify thereto in the form of an opinion or otherwise.'

"Rule 704, W.R.E., says:

" 'Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces

an ultimate issue to be decided by the trier of fact.'

"This court, in harmony with the language of Rule 702, W.R.E., has said that expert testimony is admissible if it is helpful to the trier of fact. *Buhrle v. State*, Wyo., 627 P.2d 1374 (1981); *McCabe v. R.A. Manning Construction Company, Inc.*, Wyo., 674 P.2d 699 (1983); *Reed v. Hunter*, Wyo., 663 P.2d 513 (1983)."

■ It is difficult to see how Dr. Roach's proposed testimony would have helped the jury in determining whether or not appellant at the time of the criminal conduct lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. Appellant may very well have been suffering from bipolar affective disorder, schizoaffective disorder and other maladies, but that showing is insufficient to excuse him from the crime. He must further show that, because of this mental condition, he "lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." § 7-11-304(a).

"It has been held generally that the admission of evidence is within the sound discretion of the trial court and absent a clear abuse of discretion will not be disturbed. It is also the general rule that the foundation, relevance, competency, materiality, and remoteness are within the sound discretion of the trial court and will be upheld on appeal absent a clear abuse of discretion." *Taylor v. State*, Wyo., 642 P.2d 1294, 1295 (1982).

Appellant has not demonstrated that the court's rejection of the proposed testimony of Dr. Roach was an abuse of discretion.

## II

In his second issue appellant argues that "the district court erred in allowing the prosecution to introduce evidence of check fraud when appellant was never charged with check fraud."

Evidence was produced at trial that several of Diggie's checks were cashed by appellant after Diggie had been killed.

Two different types of checks were involved. The first was a check for $500, which Diggie received shortly before he was killed. This check was in addition to his regular allowance and had been sent by his conservator, in response to Diggie's request for additional funds. The other checks constituted the $1,400 per month stipend, and were received by appellant at his post office box after Diggie's death; they were cashed and used by appellant for his own benefit.

■ The record reflects that the $500 check was connected directly with the events of October 2, 1985. Everyone at the party knew that Diggie had the check, because he had been "waving it around." Diggie was forced to sign the check as he lay bleeding on the floor. The evidence indicates that appellant was enraged when Diggie bloodied the check, rendering it non-negotiable, and vented his anger by stabbing him. Thus, all testimony regarding the $500 check was an integral part of the events of the evening Diggie was killed, and was admissible under the "course of conduct" exception to Rule 404(b), Wyoming Rules of Evidence. *Crozier v. State*, Wyo., 723 P.2d 42, 49-50 (1986). In *Scadden v. State*, Wyo., 732 P.2d 1036, 1044 (1987), we said:

"* * * The testimony does not bear upon separate criminal occurrences or bad acts. Rather, it is helpful to explain what happened between appellant and his victim, and is integral to understanding the context of the crime charged. [Citations.] In some jurisdictions it is defined as the evidence of the *context of the offense* and consequently admissible with the reasoning that 'events do not occur in a vacuum and the jury has the right to have the offense placed in its proper setting.' [Citation.]"

The standard by which the admission of such "course of conduct" evidence is judged is that its probative value must outweigh its prejudicial effect. Appellant has not demonstrated that the evidence was inordinately prejudicial. The evidence of the $500 check was probative, and its admission was proper.

■ Evidence concerning several $1,400 checks made out to Diggie, and cashed by appellant after Diggie's death, presents a more difficult problem. Rule 404(b), W.R.E., provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident."

Arguably, evidence regarding the $1,400 checks was admissible on the theory that they constituted part of the history of the killing or served to enhance the natural development of the facts. *Crozier v. State*, supra. The state argues that evidence regarding the checks tends to show motive and part of the offense. However, it is noted that motive is not an element of the offense and need not be proved by the prosecution. Authority cited by the state to support the propriety of admitting testimony with respect to the $1,400 checks is rather thin.

■ In *Bishop v. State*, Wyo., 687 P.2d 242, 245 (1984), cert. denied 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985), this court said, " * * * we have adopted a rather liberal attitude toward admitting evidence of other crimes, wrongs, or acts. [Citations.] * * *." The prosecution relied more on the statement from Bishop than is justified. In *Makinen v. State*, Wyo., 737 P.2d 345, 347–348 (1987), *Brown v. State*, Wyo., 736 P.2d 1110, 1111–1114 (1987), *Crozier v. State*, supra, and *Bishop v. State*, supra, this court discussed admitting evidence of other crimes, wrongs, or acts. In those cases we went about as far as we want to go. We do not want to expand or extend the rule of those cases regarding the admissibility of other crimes, wrongs, or acts—at least in this case. However, the error in admitting evidence of cashing the $1,400 checks was harmless.

Rule 49(a), Wyoming Rules of Criminal Procedure, provides:

"Harmless error—any error, defect or irregularity or variance which does not affect substantial rights shall be disregarded."

See also Rule 7.04, Wyoming Rules of Appellate Procedure.

We explained the concept of harmless error recently in *Jones v. State*, Wyo., 735 P.2d 699 (1987), by stating:

"An error must be 'injurious or prejudicial' to warrant reversal, and it is the burden of the party appealing to establish the injurious or prejudicial nature of the error. *Spilman v. State*, Wyo., 633 P.2d 183 (1981). We have said with respect to Rule 49(a), W.R.Cr.P., which is the source of Rule 7.04, W.R.A.P., that: " ' * * * For an error to be regarded as harmful, there must be a reasonable possibility that in the absence of the error, the verdict might have been more favorable to the defendant.' *Hoskins v. State*, Wyo., 552 P.2d 342, 351, reh. denied 553 P.2d 1390 (1976), cert. denied 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977)."

Further, admission of improper evidence does not mandate reversal of a conviction in all instances. *United States v. Corey*, 566 F.2d 429, 432 (2d Cir.1977). Federal courts have held that the improper admission of similar acts evidence under Rule 404, Federal Rules of Evidence, can be harmless error. *United States v. Chilcote*, 724 F.2d 1498, 1502 (11th Cir.), cert denied 467 U.S. 1218, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984); *United States v. Cross*, 638 F.2d 1375, 1381 (5th Cir.1981); *United States v. Bettencourt*, 614 F.2d 214, 218 (9th Cir.1980); *United States v. Bosch*, 584 F.2d 1113 (1st Cir.1978).

Because of the abundance of inculpatory evidence introduced against appellant, we hold there is not a reasonable possibility that the verdict would have been different. In its totality, the other evidence introduced was overwhelming in showing that appellant was an accessory before the fact to first degree murder. It is inconceivable that a jury would be influenced to convict appellant of a crime of the magnitude charged here because they found out that

he had improperly cashed some checks owned by the deceased. Any error in admitting evidence regarding the $1,400 checks was harmless.

### III

Appellant complains that the trial court did not give his proposed instructions on mental illness or deficiency. The court's instruction number "22" was identical to the form set out in WPJIC § 2.101, "Direct and Circumstantial Evidence." Appellant proposed instruction "D" instead of number 22, which was the same as instruction number 22 except that it added instructional materials regarding burden of proof with respect to mental illness or deficiency. A burden of proof instruction on mental illness or deficiency was given in the court's instruction number "14." It perhaps is a better practice, as the court did here, not to combine a direct and circumstantial evidence instruction with a mental illness or deficiency instruction. If the concept of direct and circumstantial evidence is in the same instruction as burden of proof on mental capacity, the jury might erroneously believe that the rule on direct and circumstantial evidence is limited to evidence concerning mental capacity.

The court's instruction number 14 contained the exact language of § 7–11–305(b), as set out above, except for the first sentence, the addition of one word and the substitution of another word.

■■■ Appellant proffered instruction "E" as a substitute for the court's instruction number 14. Appellant's proposed instruction E is substantially the same as instruction number 14, except that it contained the following additional language:

"* * * Once evidence has been presented, the presumption that the Defendant is mentally responsible evaporates. The question is whether the Defendant has met his burden of proof. After this burden is met, the burden shifts to the prosecution to prove beyond a reasonable doubt all the elements of the crime charged, including the mental responsibility of the Defendant.

"Thus, if you do not believe that the state has proven beyond a reasonable doubt that the Defendant was mentally responsible, then you should find him not guilty by reason of mental illness or deficiency."

The additional language proposed by appellant in his proposed instruction E is not a correct statement of the law. There is no shifting of the burden of proof to the prosecution to prove beyond a reasonable doubt all elements of the crime charged. The prosecution had that burden from the beginning. Furthermore, mental responsibility is not an element of the crime charged.

In *Brooks v. State*, Wyo., 706 P.2d 664, 665–667 (1985), this court said:

"We do not disagree with appellant that intent is an essential element of each of the crimes charged, nor do we disagree with appellant's argument that the mental responsibility statute, as amended, shifts the burden of persuasion to the accused to prove his mental deficiency.

"Under the applicable insanity statute before July 1, 1983, the prosecution had the burden of proving all of the essential elements of the crime charged and the mental responsibility of the accused. [Citations.] Under the former statute, a determination of insanity precluded a finding of guilt. Thus, mental responsibility was an integral part of the determination of guilt.

"Since July 1, 1983, under the statute in effect at the time of appellant's conviction, the prosecution was not required to prove the accused's mental responsibility. The effect of this statute places the burden of proving lack of mental responsibility to the accused. Under the former statute, insanity precluded criminal responsibility, while under the current statute insanity does not preclude guilt but excuses it.

"Under the current statute, mental responsibility is an affirmative defense to be proved by the greater weight of the evidence. * * *

"* * * *

"We hold that mental responsibility is not an element of the offense charged.

It is an issue separate and apart from the essential element of criminal intent. Mental illness or deficiency is an affirmative defense which relieves an accused of responsibility for the crime he committed. Requiring the accused to prove the affirmative defense of mental illness or deficiency does not constitute a shifting of the burden of proof to the accused to disprove an essential element of the crime charged."

Appellant's proffered instruction E adds to the prosecution's burden. Such additions are not contemplated by the current mental responsibility statute, and appellant has cited no authority for the additional matters contained in the proposed instruction. The trial court properly rejected appellant's proposed instruction E.

Appellant's proposed instruction "F" reads:

"Mental illness or deficiency can be brought about by the continuous use of intoxicating liquor or drugs. A defendant is not barred from using the defense of lack of mental responsibility because his mental illness or deficiency was brought about by long-term use of any such substance."

Appellant contends that it was error for the trial court to refuse to give this instruction. His argument in support of giving proposed instruction F is not supported by cogent argument or authority; therefore, we are not justified in considering it. *Boehm v. Cody Country Chamber of Commerce*, Wyo., 748 P.2d 704, 710 (1987). Furthermore, appellant makes no reference to evidence in support of the instruction. In addition, the instruction misstates the law. Section 7-11-304(a), states that " * * * the terms mental illness or deficiency mean only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality *and that are not attributable primarily to self-induced intoxication * * *.*" (Emphasis added.) Finally, to the extent intoxication was relevant to the issues before the jury, its effect was accurately explained by instructions "17"

and "18." There is no merit to appellant's contention.

IV

Appellant complains that the trial court's instructions did not adequately explain his theory of defense. We do not disagree with appellant that the court has a duty to instruct the jury on defendant's theory of the case. *Sanchez v. State*, Wyo., 694 P.2d 726, 727 (1985). We believe, however, that duty was discharged here.

It is the duty of the trial court to instruct the jury on the general principles applicable to a case. *Sodergren v. State*, Wyo., 715 P.2d 170, 181 (1986); and *Benson v. State*, Wyo., 571 P.2d 595, 597 (1977). The court may properly refuse incorrect or inapplicable statements of the law. *Benson v. State*, supra. The court may also refuse a requested instruction, even if correct, where the principles of the instruction have been covered properly and sufficiently by other instructions. *Sanchez v. State*, supra. A defendant cannot complain merely because the precise words he requested are not embodied in an instruction. *Sodergren v. State*, supra.

"The general rule * * * involving instructions is that the trial judge is afforded latitude to tailor the instructions to the facts of the case, and reversible error will not be found as long as the instructions, when reviewed as a whole and in the context of the entire trial, fairly and adequately cover the issues. [Citations.]" *Scadden v. State*, supra, at 1053-1054.

The court's instruction number "19" stated:

"It is the Defendant's position that he was only an accessory after the fact. The defendant maintains that he did not knowingly counsel, encourage, hire, command or procure the killing of D. Lawrence [sic] DeGroff by Leland Duane Brown. However, once the killing had occurred, the Defendant concedes that he became an accessory after the fact.

"The Defendant is not charged with being an accessory after the fact. If you find that the Defendant did not aid and

abet the homicide before the fact, you must find the Defendant not guilty."

Appellant's proposed instruction "A" was the same as the court's instruction, except that it proposed a substitute second paragraph that read:

"Since the prosecution did not charge the Defendant with being an accessory after the fact and the prosecution has opposed allowing that crime to appear on the verdict, you, the jury, do not have the ability to find the Defendant guilty of the crime. However, if you find that the Defendant did not aid and abet the homicide before the fact, but only became involved as an accessory after the fact, you must further find the Defendant not guilty."

Appellant also proffered his instruction "B," addressing elements of the crime of accessory after the fact, and instruction "C" addressing statutory definition of the crime accessory after the fact.

■ The substitute paragraph suggested by appellant in his proposed instruction A is not theory of the case language but rather an argument on the wisdom of the state charging appellant with being an accessory before the fact, rather than charging him with being an accessory after the fact. The court's instruction number 19 adequately explained appellant's theory of the case.

■ We see no purpose in setting out the accessory after the fact statute, instruction B, or instruction C, which explained the element of accessory after the fact. It would have been confusing to the jury to be instructed on a crime not charged, and one on which they could not convict.

## V

In the final issue, appellant contends that it was error for the court to refuse to instruct the jury on the lesser included offense of aiding and abetting manslaughter. Appellant's proposed instruction "G" sets out the elements of manslaughter, and his proposed instruction "H" recites the

manslaughter statute. See § 6–2–105, W.S.1977 (Cum.Supp.1985).[5]

■ These proposed instructions are insufficient as aiding and abetting manslaughter instructions. They, in fact, say nothing about aiding and abetting, but merely address manslaughter as though that were the charge.

" * *. * To convict one of aiding and abetting the commission of a substantive offense, the prosecution must prove that the substantive offense was committed by someone and that the person charged as an aider and abettor *associated himself* and participated in the accomplishment and success of the criminal venture. * * * " (Emphasis added.) *Haight v. State*, Wyo., 654 P.2d 1232, 1238 (1982).

There was an abundance of evidence that appellant associated himself with Yosemite Brown and participated in the killing of DeGroff. Brown plead guilty to first degree murder, thus admitting to each and every element of first degree murder, including premeditated malice. While a determination that Brown killed with premeditated malice may not be binding on appellant, there is no evidence that the killing was less culpable.

■ The established standard for instructing the jury on lesser-included offenses is based on the following five part test: (1) a proper request is made; (2) the elements of the lesser-included offense are identical to part of the elements of the greater offense; (3) there is some evidence that would justify conviction of the lesser-included offense; (4) the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser-included offense, and; (5) mutuality exists such that the lesser-included charge can be demanded by either the prosecution or the defense. *Jahnke v. State*, Wyo., 692 P.2d 911, 917–918 (1984). The five-part test was adopted from *United States v. Chapman*, 615 F.2d 1294, 1299 (10th Cir.),

**5.** Section 6–2–105, W.S.1977 (Cum.Supp.1987), contains identical language.

cert. denied 446 U.S. 967, 100 S.Ct. 2947, 64 L.Ed.2d 827 (1980).

Appellant directs our attention to testimony that, during the festivities of October 2, 1985, liquor flowed freely and that Bulldog Miller and Yosemite Brown consumed their fair share. Also, there was testimony that Brown did not remember stabbing DeGroff and that he did not know he killed DeGroff. From this scanty background appellant asks the court to elevate this testimony and consider it evidence negating Brown's admitted premeditated malice. Appellant cites no authority in support of this quantum leap.

We are not persuaded that the evidence of Brown's drinking on the night of DeGroff's murder provides the requisite connection to require a lesser-included instruction on aiding and abetting manslaughter. Even if we assume, arguendo, that it does, such an error would have been harmless. In *Roberts v. State*, Wyo., 711 P.2d 1131, 1137 (1985), we stated:

"Our inquiry does not end with our conclusion that the last sentence in [the instruction] was erroneous. 'Errors in instructions not injurious or prejudicial are not cause for reversal, and the appellant has the burden of showing harmful error.' *Mainville v. State*, Wyo., 607 P.2d 339, 343 (1980). In fact, even instructional error of constitutional dimensions may be ignored in some cases. The United States Supreme Court recently stated in *Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 976, 74 L.Ed.2d 823 (1983): " '[I]n light of *Chapman* [*v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967)] these cases cannot be read for the broad proposition that instructional error of constitutional dimensions may *never* be harmless.' * * * "

If the jury had been instructed on aiding and abetting manslaughter, it would not have changed the result. The jury was in fact, instructed on the lesser-included offense of aiding and abetting second degree murder, but they nevertheless found appellant guilty of aiding and abetting first degree murder. The numerical placement and tenor of the court's instructions clearly directed the jury to first consider whether or not appellant was guilty of aiding and abetting first degree murder. The jury was further instructed that if they found in appellant's favor on being an accessory to first degree murder, then they were to consider whether or not he was guilty of aiding and abetting second degree murder. Any error in not giving an instruction on the lesser-included offense of aiding and abetting, manslaughter was rendered harmless by the verdict "guilty of aiding and abetting first-degree murder."

Because of the jury's determination that appellant was guilty of aiding and abetting first degree murder, there was no point in considering the instruction on aiding and abetting second degree murder, much less an instruction on aiding and abetting manslaughter. *People v. Williams*, 143 Mich. App. 574, 374 N.W.2d 158, 164 (1985); *People v. Ramos*, 110 A.D.2d 860, 488 N.Y.S.2d 92 (1985), and cases cited therein. Considering the jury verdict, it is inconceivable that it would have considered the lesser offense of aiding and abetting manslaughter. See *Cutbirth v. State*, Wyo., 663 P.2d 888, 891–892 (1983). The trial court did not abuse its discretion in refusing to give the proposals appellant characterizes as aiding and abetting manslaughter instructions.

We have carefully considered appellant's five issues and find no reversible error.

Affirmed.

THOMAS, J., filed a concurring opinion.

URBIGKIT, J., filed a specially concurring and dissenting opinion.

THOMAS, Justice, concurring.

I agree with the disposition of this case according to the majority opinion, and I am satisfied with the justification for that disposition except for the conclusion of the court that there was harmless error committed in the admission of evidence relating to the $1,400 monthly stipend checks issued to DeGroff and cashed subsequent to his murder. In my view, that evidence was admissible; there was no error with respect to the court's rulings; and, consequently, it

is not necessary to justify that evidence under the harmless error doctrine.

In *Coleman v. State*, Wyo., 741 P.2d 99 (1987), the court outlined a process pursuant to which a trial judge should articulate the reasons for his decision in admitting evidence manifesting the resolution of the tandem of conditions for admission set forth in Rules 402, 403 and 404, W.R.E. In this case, the record does not contain an explanation by the trial judge of the decision to admit the evidence relating to the $1,400 checks. This record clearly demonstrates, however, that the theory of the prosecution was, in part, that the murder of DeGroff was attributable to Miller's avarice. The majority correctly finds that the evidence concerning the $500 check was relevant to motive, as the prosecution argued. In my view, the evidence concerning the $1,400 monthly stipend checks is equally relevant with respect to motive.

Consider these events in context. The goose that laid the golden egg had been senselessly assaulted. The $500 check was lost, but it was not the only potential golden egg. The eggs of the future, however, would be lost if the goose, dissatisfied with the inhumane treatment it had received, elected to migrate. Those golden eggs, however, still could be gathered so long as no one else knew that the goose was dead. Therefore, it became necessary to kill the goose in order to secure the golden eggs that were yet to be. This is not a far fetched motive for the killing of DeGroff, and the proof with respect to the cashing of those checks demonstrates its validity.

While the majority correctly notes that motive is not an element of the offense of first-degree murder, motive is evidence that is relevant to establish premeditation, one of the essential elements of that offense. See *Coleman v. State*, supra. Premeditation obviously was an issue in this case, and Miller's justification for De-Groff's death, a rather inane explanation, manifested a sharp contest of the presence of that element. The prosecution needed to establish that element, however, in order to achieve a conviction on the charge of being an accessory before the fact to the crime of first-degree murder.

The removal of DeGroff's driver's license from his wallet, before disposing of the wallet along with his clothes and his body, and the use of that license to cash the $1,400 checks after his murder support the theory of the prosecution that the murder was committed to gain control of the funds represented by the monthly checks. Viewed in this light, the cashing of the checks substantiates a motive for killing DeGroff which would justify a conclusion that his murder was premeditated and satisfies the requirements of Rule 404(b), W.R.E. The requirements of Rules 402 and 403, W.R.E., also are satisfied, and this evidence was admissible pursuant to the analysis set forth in *Coleman v. State*, supra. I would hold that there was a legitimate basis for the trial court's decision to admit the evidence of cashing the $1,400 checks, and no error occurred with respect to that evidence.

URBIGKIT, Justice, specially concurring and dissenting.

I join with Justice Thomas in his special concurrence as it considers the issues presented in Section II of the court's opinion. I dissent from present approval of the trial court's denial of the admission of psychiatric testimony by defendant's doctors as addressed in Section I. At issue in this atrocious homicide case was a plea of not guilty by reason of mental illness. Relevant and material on the subject to be addressed was proposed testimony by the accused's own doctors. That tendered evidence was denied admissibility although directly related to the personal observation of the character and conduct of the accused defendant by the expert witness.

In *Brown v. State*, Wyo., 736 P.2d 1110 (1987), testimony of a similar character, when addressed to support the prosecution witness, was found to be acceptable. Furthermore, in adjudicative consistency, it is necessary to compare this case with the kind of testimony deemed by this court to be appropriate in *State v. Zespy*, Wyo., 723 P.2d 564 (1986). See also *Scadden v.*

*State*, Wyo., 732 P.2d 1036 (1987); and *Lessard v. State*, Wyo., 719 P.2d 227 (1986). Zespy cannot logically be distinguished where, in that decision, "lay person expert" testimony and "scientific expert" testimony were permitted. The thesis of the latter witness, as a forensic witness careered in testifying in criminal cases to attack insanity defenses, was that psychiatric analysis for courtroom testimony was invalid. It would lead then to rationally be concluded that the testimony of a witness who does not know anything is admissible, while here the testimony of a witness about the bizarre psychiatric character of the defendant is inadmissible as conceptionally addressing a mental illness and not a mental deficiency as stated:

"A. It was my impression that the symptoms of the illness and his family history were most compatible with the diagnosis of Bipolar Affective Disorder, which is a manic depression, and Schizoaffective Disorder. It was my opinion the former term is most appropriate of the two which was Bipolar Affective Disorder or Manic, primarily because the latter term, Schizoaffective Disorder, is kind of a poorly defined psychiatric diagnosis.

"Q. Are those both mental illnesses?

"A. Major mental illnesses, right."

This court has either forgotten or now ignores what it said in Zespy:

"'* * * neither the trial court nor this body should substitute its opinion for that of the jury, whose finding of fact should not be interfered with if there is any substantial evidence to support it. * * * "The jury is the ultimate judge of defendant's sanity at the time of the crime, and * * * since it had before it evidence of defendant's behavior and state of mind upon the basis of which it could have found defendant sane [insane] at that time, it was not bound by the expert opinion testimony of the doctor. * * *" * * * "A jury can always disregard the testimony of an expert if the jurors find it to be unreasonable."'"
*State v. Zespy*, supra, 723 P.2d at 567, quoting *Gerard v. State*, Wyo., 511 P.2d 99, 104 (1973).

The bizarre circumstance of this homicide gives some credence to the operational insanity of all participants as tempered only by avarice, demonstrable in part by post-killing events. See Thomas, Justice, special concurrence, supra. In this case, the jury was not afforded the opportunity to consider or disregard available expert witness testimony since, in effect, the evidence admissibility rule is developed *for defense* that expert witness testimony is only admissible if it states the ultimate conclusion which embraces the same conclusion as required in the jury decision. An adjunct to the rule seems, however, to be that the ultimate opinion requirement from the psychiatrist is obviously not invoked where lay person expert testimony on mental condition is to be afforded as demonstrated in Zespy. All of this postulates, as the Wyoming rule in the insanity defense case, that the only evidence available from the scientist is an opinion telling the jury what its decision should be *where the witness testifies for the defense.*

If there is anything uniform in the opinions of this court, in this area of psychiatric, sociological and motivationally directed expert testimony, it is that the expert witness testimony is admissible to prosecute and inadmissible to defend. Evenhanded justice this is not.

Wyoming has nine recent cases, with this as the tenth, where the admissibility of scientific behavioral-related, mentally-defined, expert-witness evidence was considered. In Brown, this court approved testimony when a clinical psychologist enunciated a perceived mentally related testimony-reliability factor, albeit over strong objection and dissent from two members of the court. In Lessard, the court found a rape crisis counselor to be an appropriately viable witness and evidence admissible that "the victim's behavior was consistent with sexual assault." Likewise in Scadden, behavioral analysis for prosecution purposes was deemed admissible evidence when presented by the "expert." Finally, Zespy is in accord with admissibility for prosecution purposes with insanity plea.

State of mind expert witness evidence for the defense was denied in *Smith v. State*, Wyo., 564 P.2d 1194 (1977) as a psychiatric evaluation which enunciated an admissibility standard as contrary to the later developed concept of Brown, Scadden, Lessard and, to a degree, *Zespy*. The difference in Smith was a resolution that psychiatric evidence was only available with a technical insanity plea (which in fact does exist here). *Buhrle v. State*, Wyo., 627 P.2d 1374 (1981); *Engberg v. State*, Wyo., 686 P.2d 541, cert. denied 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984), second appeal presently pending in this court—*Engberg v. Shillinger*, No. 87-15; *Jahnke v. State*, Wyo., 692 P.2d 911 (1984); and *Krucheck v. State*, Wyo., 702 P.2d 1267 (1985) defined inadmissibility in result as evidence used to defend. The box score for the ten recent cases is: three opinions—admission for prosecution approved, conviction affirmed; one opinion-rejection for prosecution disapproved when considered by bill of exception; six opinions—admission for defense denied, conviction affirmed. This is a ten to zero result.

Persuasively, the only common thread to be found in Wyoming precedent, as now repeated by this decision, is admissibility of scientific behavioral-related, mentally-defined evidence for conviction and rejection for defense. In this case, I am forced to conclude that the rejection of the scientific evidence, expert-witness testimony results in a destruction of due process and denial of equal protection in constitutional terms. Under the Wyoming Constitution, it represents a disregard of Art. 1, § 10, right to witnesses and Art. 1, Section 6, due process.

I would ascribe denial of testimony to defend against a murder charge from the defendant's own doctors which would have considered his mental condition to be not only inappropriate but prejudicial, and consequently dissent from Section I of the court's opinion.